Daniel J. Kornstein (DK – 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600
Attorneys for Plaintiff

JUDGE SAND

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

SUMMIT PROPERTIES INTERNATIONAL, L.L.C.,     :

07 CV 10407

         Plaintiff,     :

07 Civ. _____
ECF CASE
COMPLAINT

   - against -     :

RECEIVED
NOV 16 2007
S.D. N.Y.
CASHIERS

LADIES PROFESSIONAL GOLF ASSOCIATION,     :
         Defendant.

JURY TRIAL DEMANDED

-------------------------------------------------------------X

     Plaintiff, by its attorneys, Kornstein Veisz Wexler & Pollard, LLP, for its complaint

alleges as follows:

Jurisdiction and Venue

     1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1),

based on diversity of citizenship.

     2.      The amount in controversy, exclusive of interest and costs, exceeds $75,000.

     3.      The action arises under the common law and under 28 U.S.C. § 2201 *et seq.*

     4.      Venue in this District is proper under 28 U.S.C. § 1391.

Parties

5.    Plaintiff Summit Properties International ("SPI") is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business at 600 Third Avenue, New York, New York 10016.

6.    SPI, at all relevant times, has been in the business of merchandising its clients' trademarks.  It negotiates and administers licensing agreements on behalf of its clients, pursuant to which licensees use SPI's client logos and other marks on the licensees' products.   Among SPI's clients was defendant Ladies Professional Golf Association ("LPGA").

7.    Defendant LPGA, on information and belief, is a non-profit corporation duly organized and existing under the laws of the State of Ohio, with its principal place of business at 100 International Golf Drive, Daytona Beach, Florida 32124.

8.    At all relevant times, LPGA was, on information and belief, a women's professional sports association whose activities include running the LPGA golf tournament as well as a variety of other programs intended to promote women's and youth golf.

FIRST CLAIM
(Breach of Contract -- Damages)

The Agreement

9.    On October 1, 1999, LPGA and SPI entered into a written Representation Agreement that appointed SPI the exclusive licensing representative for LPGA for the world outside of the United States.

10.    On November 1, 2002, the parties executed an Amended and Restated Representation Agreement (the "Agreement") that expanded SPI's role, by appointing SPI the

2

exclusive licensing representative for LPGA within the United States as well as outside the United States. A copy of the Agreement is annexed to this Complaint as Exhibit A.

11.    In September, 2006, SPI timely exercised its option to extend the Agreement through December 31, 2009.

12.    The Agreement granted SPI "the exclusive and sole right to solicit . . . any person, firm, corporation or other entity as a Licensee and negotiate License Agreements" on the LPGA's behalf. Ex. A, § 2(b)(i).

13.    SPI's role under the Agreement was to find suitable licensees for LPGA's Property, which was defined to include "the trademarks, trade names, identifications, logos, insignia, mascots, symbols, and official proprietary designations and identifiable portions thereof, of LPGA and affiliates existing during the Term" of the Agreement. Ex. A § 1(j), as well as "all new trademarks and logos and revisions of the Property." Ex. A § 2(f).

14.    SPI's rights under the Agreement with respect to the Property were exclusive. Section 2(b)(iii) of the Agreement provided that "LPGA shall not license, and shall not permit the renewal of any license of, the merchandising of the Property . . . either itself or through any representative, licensee or agent, other than SPI."

15.    Section 2(b)(i) of the Agreement required the parties to work together "in good faith" to merchandise the Property.

<u>Licensee Approval Process</u>

16.    The Agreement, in section 2(b)(ii), outlined the way in which SPI was to pursue merchandising opportunities for LPGA. It provided that SPI would contact a prospective licensee and, if the prospective licensee were interested, SPI was to negotiate the financial and

3

business terms of a license. SPI would then prepare and send to LPGA a "Deal Memo" containing the negotiated terms.

17.     According to section 20(b) of the Agreement, LPGA then had ten days to accept or reject a licensing deal and was prohibited from unreasonably withholding or delaying approval. If LPGA did not notify SPI of its approval, consent or denial in writing within 10 days, the deal would be deemed approved.

18.     If the deal were approved, SPI was to prepare a license agreement, send it to the licensee for execution, and forward the licensee-executed contract to LPGA for its signature.

19.     If LPGA rejected a deal, it was required by section 20(b) of the Agreement to "provide SPI with a written memo indicating the reasons for LPGA's disapproval in detail reasonably calculated to guide SPI (and, where applicable, a Licensee) in formulating or finding an acceptable replacement or alternative and in assessing future prospects and actions."

SPI's Related Obligations

20.     Beyond brokering licensee agreements, SPI was responsible, under section 2(b) of the Agreement, for servicing licensees' accounts "as SPI has done in prior practice," meaning the practice that SPI followed during the term of the agreement in place from 1999 through 2002.

21.     Section 6(b) of the Agreement provided that SPI was to conduct quality control reviews of proposed Property uses to monitor licensees' compliance with LPGA's Quality Control Approval Guidelines, which LPGA was to issue "as soon as reasonably practicable." LPGA never furnished SPI with these guidelines.

4

<u>Guarantees and Distribution of Royalty Payments</u>

22.    Section 3(a)(i) of the Agreement provided that SPI was to pay LPGA a series of installment payments over the term of the Agreement, called "Guarantees."

23.    The guarantees functioned as loans, or "advances," to LPGA against LPGA's share of the royalties to be earned in connection with license arrangements brokered on LPGA's behalf by SPI.

24.    The Agreement spelled out how the incoming royalties from licensees were to be allocated to each of SPI and LPGA.

25.    Under the Agreement, LPGA was not entitled to any royalties until: (a) SPI had recouped its advance guarantee payments, and (b) the amount of SPI's share of royalties was equal to the amounts already received by LPGA in the form of SPI's guarantee payments. Section 3(a)(i) of the Agreement states:

> Royalties shall be apportioned first to recoupment by SPI of any advance payments of LPGA's Share (including Guarantee Payments), then to payments of SPI's Share until LPGA's Share and SPI's Share of Royalties are fully paid, and thereafter in proportion to the parties in accordance with their respective shares (for clarity and for avoidance of doubt, it is acknowledged by the parties that Guarantee Payments may not be recouped by SPI until they are actually paid).

26.    Section 3(b)(iii) of the Agreement also states:

> To the extent, on any date above, the cumulative amount of LPGA's Share paid by such date does not equal or exceed the Guarantee Amount then due, SPI shall advance to LPGA the difference ("Guarantee Payment"). Guarantee Payments, once made, shall be deemed advance payments of LPGA's Share under Section 3(a) and 3(b) hereof and recouped by SPI as specified in this agreement.

27.    How these sections of the Agreement operate is best illustrated by example. Assume that SPI paid LPGA $2 million in guarantees. Upon SPI's payment of such amounts, LPGA then had $2 million, and SPI was $2 million behind. In other words, there was a $4

5

million spread between what LPGA had ($2 million) and what SPI had (negative $2 million). The first $2 million in royalties earned were, under the Agreement's express terms, to be paid to SPI in recoupment of SPI's previously-advanced Guarantee Payments.

28.     Once that $2 million had been paid to SPI, SPI's share was at zero, up from minus $2 million. LPGA, having previously been paid the $2 million in guarantees, was now $2 million ahead of SPI. Therefore, SPI was entitled, under the Agreement, to the next $2 million in royalties.

29.     Once this had been paid, and only then, were LPGA and SPI to share in the additional royalties. According to section 3(a)(i) of the Agreement, the parties were to split those royalties on a 50/50 basis, except that once SPI's royalty share had exceeded $8,531,195.00, SPI's share of the royalties would be reduced to 40%.

30.     To ensure full disclosure of incoming royalties, section 4 of the Agreement required each party to give the other "a full and accurate statement" of all royalties received from third parties.

Termination and Default Provisions

31.     The Agreement provided in section 16(b) that if a party caused an "Event of Default" under the Agreement, the non-defaulting party had the right to terminate the Agreement and would be entitled to "any and all remedies available at law or equity."

32.     An "Event of Default" was defined in section 16(a) of the Agreement to include: a default in payment if it continued for 30 days after written notice, default in the performance or observance of any material non-monetary term if it continued for 30 days after written notice, and any false or misleading material representation or warranty contained in the Agreement if it

6

continued for 30 days after written notice.

33.    Under section 18(a) of the Agreement, only SPI had the right to terminate the Agreement absent an Event of Default.  LPGA had no reciprocal right to do so.

34.    SPI also had the right, under section 18(a) of the Agreement, to extend the term of the Agreement through the end of 2009, as long as it gave notice before October 2006, and, under section 18(c), to further extend the term of the Agreement through December 31, 2012 as long as it gave notice on or before February 1, 2009.

35.    The Agreement provided, in section 15,  that upon its termination or expiration, SPI would continue to receive and retain all amounts to which it was entitled on license agreements (and including any extensions, renewals, modifications or substitutes of those agreements) still in force as of the termination or expiration date for three years, and an additional 30% of such amounts for one additional year thereafter.

LPGA Breaches the Agreement

36.    From approximately 1999 through mid-2005, SPI and LPGA enjoyed a productive working relationship under the Agreement.

37.    In June or July 2005,  LPGA appointed a new Commissioner, Carolyn Bivens, and it was soon after that appointment that LPGA began to breach the terms of the Agreement.

38.    LPGA set about breaching the Agreement in such a way as to make it difficult or impossible for SPI to perform, so as to manufacture a pretextual reason to terminate SPI.  LPGA breached the Agreement in various ways, including but not limited to:

　　　　a. LPGA violated section 20(b) of the Agreement by failing to timely respond to deal memos furnished by SPI.

7

b. LPGA violated section 20(b) of the Agreement by withholding approvals of proposed deals with licensees but never explaining to SPI why it was doing so.

c. On other occasions, LPGA gave its approval to a deal, only to attempt to amend the deal months later.

39.    As a result of the above breaches by LPGA, SPI was often left in uncomfortable and unproductive positions with potential licensees. SPI could neither confirm that a deal was in place, nor could it try to salvage potentially lucrative relationships by re-negotiating a particular term of the proposed deal that LPGA, belatedly, may have deemed objectionable.

40.    Because of LPGA's behavior, several potential licensee relationships that could have been successful were never consummated. SPI was well en route to brokering deals with many licensees but was ultimately thwarted from doing so due to LPGA's refusal to communicate in a timely or predictable way.

41.    LPGA also violated sections 2(b)(i) and 2(b)(iii) of the Agreement by cutting SPI out of the licensing process and dealing directly with the licensees and potential licensees itself.

42.    LPGA further breached the Agreement by making unjustified demands on SPI for work by SPI that the Agreement itself nowhere required SPI to perform.

43.    LPGA made these unreasonable demands for work by SPI to lay the groundwork for a false claim of non-performance on SPI's part.

44.    LPGA began, for instance, demanding intensive research documentation and marketing reports -- tasks nowhere required under the Agreement. On one particular occasion in the summer of 2005, LPGA sent SPI requests for detailed marketing information regarding licensees and territories. In a good faith effort to comply with this demand, SPI, despite having

8

no contractual obligation to do so, sent copies of licensee royalty reports to LPGA's financial officer. LPGA's counsel had told SPI that these reports would satisfy LPGA's demands.

45.     Later in 2005, LPGA asked SPI for a strategic business plan, even though the Agreement nowhere required SPI to provide such a plan.

46.     To accommodate LPGA's demands and in its ongoing efforts to act in good faith, SPI nevertheless created a strategic plan including projections for future royalties which it then provided to LPGA in December, 2005.

47.     Despite LPGA's then Chief Marketing Officer's favorable comments on early drafts and on SPI's formal presentation of the plan in January 2006 wherein SPI predicted strong growth in royalties, LPGA criticized SPI's plan in a February 6, 2006 letter and demanded answers to a list of questions. In this February letter, LPGA said that it would refuse to consider further deals negotiated by SPI until SPI provided "satisfactory" answers to various detailed questions.

48.      On March 7, 2006 and in an effort to accommodate LPGA's demands, SPI responded to the February 6 letter by preparing and sending a detailed and lengthy operations overview addressing LPGA's questions and describing SPI's business and plans. LPGA never bothered to respond to SPI's submission, on which SPI had labored intensely.

49.     LPGA's conduct got worse. LPGA began to actively interfere with SPI's efforts to broker license arrangements.

50.     By March, 2006, LPGA essentially prevented SPI from doing any further work. By letter dated March 8, 2006, and just as LPGA had stated in its February 6 letter, LPGA's outside counsel reiterated to SPI that LPGA would not authorize any new agreements until SPI

answered a host of detailed questions concerning SPI's business operations and plan, even though SPI was not required to provide any such information under the Agreement.

51.     The March 8, 2006 letter also complained that LPGA had not received certain licensee royalty reports from SPI, even though SPI had provided those reports months before, despite having no contractual obligation to do so.

52.     SPI responded to each of LPGA's questions by letter dated March 15, 2006. LPGA never bothered to respond to this letter.

53.     In April 2006, SPI executives flew to Atlanta to present Ms. Bivens and her staff details of a significant opportunity for dramatic growth in royalties from the United States (earlier described as a "difficult" market by LPGA senior staff).  Despite LPGA's promise of a quick reply, there was no response.

54.     Despite SPI's full performance under the Agreement, LPGA's counsel sent SPI a letter on June 2, 2006 purporting to unilaterally terminate the Agreement based on SPI's alleged defaults.

55.     In the termination letter, LPGA falsely claimed that SPI had defaulted under its Agreement obligations by, among other things, "not providing complete information on royalties, revenues and products licensed on behalf of the LPGA"; failing to enforce "quarterly royalty statements from licenses"; and by "not consulting regularly with the LPGA regarding new merchandising opportunities."

56.     LPGA did not specify which Agreement provisions these alleged defaults breached, nor could it have done so, as none of these alleged "defaults" were on any obligations imposed in the Agreement.

57.    LPGA purported to terminate the Agreement as soon as it was SPI's turn to begin profiting from the parties' arrangement.

58.    As of the time of the termination, SPI had made annual guarantee payments to LPGA totaling approximately $2,232,500. These payments were made on or around December 31 each year from 2000 through 2005.

59.    Although SPI has since recouped its guarantee payments, it has earned only $224,168.16 in royalty payments, meaning that SPI is owed, under sections 3(a)(i) and 3(b)(iii) of the Agreement, an additional $2,008,331.34 in royalties before LPGA is entitled to any royalty share.

60.    Rather than abide by its royalty sharing obligations under the Agreement, LPGA instead purported to terminate the Agreement altogether and cut SPI out.

61.    It did so on the false pretext of SPI's alleged defaults, when in fact SPI in no way defaulted under the Agreement.

62.    To the contrary, SPI exceeded all reporting obligations under the Agreement, furnished LPGA with all required royalty reports as well as additional business plans that LPGA demanded, was diligent in seeking and negotiating new licensing opportunities for LPGA, and timely provided LPGA with deal memos for its approval.

63.    SPI has fully performed under the Agreement and would still be doing so today had LPGA not prevented its performance by way of its obstructive behavior and purported termination.

64.    Since 2005 alone, SPI has solicited many licensing agreements on the LPGA's behalf, merchandised and marketed the Property, resulting in license agreements with or

11

proposals from various licensees and potential licensees.

65.    LPGA breached the Agreement in various ways as described above, including by: terminating the Agreement without cause, failing to communicate timely or effectively with SPI about proposed deals, trying to cut SPI out of deals entirely by transacting directly with potential licensees, and interfering with SPI's efforts to negotiate new licenses.

66.    As a result of LPGA's breach of the Agreement, SPI has sustained damages in an amount to be determined at trial, but in any event, not less than $5,000,000.

## SECOND CLAIM
(Breach of Contract – Injunction)

67.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 66 of this complaint.

68.    Section 2(b)(i) of the Agreement granted SPI the exclusive and sole right to solicit any person, firm, corporation or other entity as a Licensee and negotiate License Agreements on the LPGA's behalf.

69.    Section 2(b)(iii) of the Agreement specifically prohibited LPGA from licensing or merchandising the Property on its own or through any representative or agent other than SPI.

70.    LPGA, in breach of these provisions, has been licensing and merchandising the Property on its own.

71.    SPI has been irreparably harmed as a result of LPGA's breach of these Agreement provisions, in that LPGA has destroyed SPI's relationships with the licensees with whom it had the exclusive right to deal.

72.    If LPGA is not enjoined from continuing to breach these provisions of the

Agreement, SPI will continue to suffer irreparable harm for which it has no adequate remedy at law.

THIRD CLAIM
(Declaratory Judgment)

73.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 72 of this complaint.

74.     SPI contends that LPGA's termination of the Agreement was invalid. This is so because the Agreement does not permit LPGA to terminate the Agreement without cause, and the alleged defaults on SPI's part that LPGA used as grounds for termination were no defaults at all.

75.     LPGA maintains that its termination was valid.

76.     There is an actual controversy between SPI and LPGA concerning their rights and legal relations pursuant to the Agreement. Unless a judgment setting forth the respective rights and obligations of the parties is rendered, a cloud will exist over the parties' business activities.

77.     SPI is therefore entitled to a declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that it has not breached the Agreement; that LPGA's purported termination of the Agreement was invalid; and that the Agreement remains in full force and effect.

FOURTH CLAIM
(Unjust Enrichment)

78.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 77 of this complaint.

79.     By virtue of SPI's hard work in brokering licensing transactions on LPGA's

13

behalf, LPGA obtained many benefits under the Agreement, in the form of long-term, lucrative relationships with licensees of LPGA's Property, as well as the guarantee payments made by SPI.

80.     LPGA will continue to reap the benefits of SPI's hard work even now that the Agreement has been terminated.  In fact, LPGA benefits far more without the Agreement in place, since LPGA has, via its purported termination, freed itself from its obligation to share the incoming royalties from SPI-brokered deals with SPI.

81.     Without the Agreement in place, LPGA is benefiting at SPI's expense.

82.     Equity and good conscience require restitution to SPI of the amounts that it should have received under the royalty-sharing provisions of the Agreement.

83.      As a result of LPGA's unjust enrichment, SPI has sustained damages in an amount to be determined at trial, but in any event not less than $5,000,000.

WHEREFORE, plaintiff demands judgment:

a.  On the first claim, awarding plaintiff damages in an amount to be determined at trial but not less than $5,000,000;

b.  On the second claim, enjoining LPGA, its officers, directors, employees, agents, and anyone acting in concert with LPGA, preliminarily and permanently, from (a) soliciting any person, firm, corporation or other entity as a Licensee; (b)  negotiating License Agreements on LPGA's behalf; (c) licensing and merchandising the Property on their own or via any agent or representative other than SPI, or (d) taking any other action in breach of sections 2(b)(i) or 2(b)(iii) of the Agreement;

c.  On the third claim, declaring that: (i) plaintiff has not breached the Agreement,

(ii) defendant's purported termination of the Agreement was invalid, and (iii) the Agreement remains in full force and effect;

     d.  On the fourth claim, awarding plaintiff an amount to be determined at trial but not less than $5,000,000; and

     e.  Granting such other and further relief as to the Court may seem just and proper, including plaintiff's costs and reasonable attorneys' fees.

Dated: New York, New York
      November 16, 2007

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By: _____
     Daniel J. Kornstein (DK – 3264)
     757 Third Avenue
     New York, New York 10017
     (212) 418-8600

     Attorneys for Plaintiff

**EXHIBIT A**

THIS AMENDED AND RESTATED REPRESENTATION AGREEMENT, made as of November 1, 2002, is between Ladies Professional Golf Association, an Ohio non-profit corporation ("LPGA") with principal offices at 100 International Golf Drive, Daytona Beach FL 32124, and SUMMIT PROPERTIES INTERNATIONAL, L.L.C., a Delaware limited liability company ("SPI"), with offices at 600 Third Avenue, New York, NY 10016. This Agreement amends and restates in its entirety the existing representation agreement between the parties dated as of October 1, 1999.

In consideration of the mutual promises and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1        Definitions.  As used herein, the terms set forth below shall be defined as follows:

(a)        **Royalties** shall, except as otherwise specifically provided herein, mean consideration received for merchandising of the Property, or for a license or authorization to merchandise the Property, in the Territory. Tax credits utilized for **taxes withheld** by Licensees shall be deemed Royalties when and to the extent so utilized. Royalties shall not, however, include:
(i) consideration paid pursuant to the Benchmark Omni Agreement; or
include,        (ii) to the extent approved in writing by LPGA, amounts kept by **sub-representatives** of SPI as compensation for sub-representation services.

**U.S. Royalties** shall, except as otherwise specifically provided herein, mean consideration received for merchandising of the Property, or for a license or authorization to merchandise the Property, in the United States of America, its territories and possessions.

(b)        Benchmark-Omni Agreement: the agreement between Benchmark Athletic Inc. and Omni Licensing Network Ltd. providing for merchandising of the LPG A Logo in Canada, which agreement expires December 31, 2001, a copy of which agreement has been provided to SPI by LPGA

(c)        License Agreement  shall mean any agreement, understanding or arrangement permitting merchandising of the Property in the Territory.

(d)        Use of the Property shall mean reproduction or display of the Property, including reproduction or display on goods or other property or on packaging and in promotion or identification of goods, entities, property or services.

(e)        merchandising of the Property: shall mean reproduction or display of the Property: (i) on (or on packaging or items attached or fastened to, or on advertising for) goods (including Premiums, but excluding LPGA Premiums), which goods are sold, or shipped pursuant to a sale, in or into the Territory; and (ii) in promotion or identification of discrete sections ("Shops -in-shops")of consumer retail establishments located in the Territory; provided that merchandising of the Property shall be subject to Section 2(b)(i) below and provided that merchandising of the Property which involves golf clubs shall be subject to Section 2(i) below.

(f)        **Shop** Agreements: shall mean agreements permitting the use of the Property in the name and other identification of retail establishments (as opposed to sections of retail establishments) in the Territory.

(g)        **Licensed Products**. "Licensed Products" shall mean merchandise or other goods  licensed pursuant to a License Agreement, including Premiums, but excluding LPGA Premiums.

(h)        Licensee. "Licensee" shall mean any party to which rights to merchandise the Property have been granted pursuant to a License Agreement.

(i)        Premiums. "Premiums" shall mean merchandise items bearing the Property whether or not such items are in conjunction with the logo, trademark or other proprietary designation of a third party, which items are sold at or below cost or given away by a third party for purposes of promoting or otherwise increasing sales of such third party's commercial services or other products, or for any other purpose, but shall not include any such LPGA-logoed products which are not available at a competitive price from Licensees and which the LPGA therefore obtains from a non-licensee company for its own purposes, such as gifts to sponsors, LPGA staff, LPGA members, gifts to charities, and not for distribution ("LPGA Premiums").

(j)        **Property**  shall mean the trademarks, trade names, identifications, **logos**, insignia, mascots, symbols, and official proprietary designations and identifiable portions thereof, of LPGA and affiliates existing during the Term including those listed on Exhibit 1(j) .  Property shall specifically include the "swinging golfer" silhouette and the designation "LPGA".

(k)        Quality Control Approval **Guidelines**.  Written reasonable guidelines issued by LPGA, setting forth color depictions of the Property, required trademark and copyright designations and standards for approving use of the Property.

(l)     **Term.** Subject to the provisions of Section 18, "Term" shall mean the period commencing as of April 1, 1999 for the Territory other than the United States and its territories and possessions and starting as of the date hereof for the entire Territory, and ending on March 31, 2007 unless extended or sooner terminated in accordance with the terms hereof.

(m)     **Territory.** "Territory" shall mean the world, provided, however, that:
>     (i) with respect to all of Section 11 (LPGA warranties) except for Sections 11(j) and (k)  (no existing licenses or conflicts) thereof, the term Territory shall not include:
>>         (I) Japan, or
>>         (II) Australia

until written notice removing the above reference to  Japan and/or Australia is received by SPI from LPGA.
>     (ii) with respect to **US military bases**, the location of the military base will control.
>     (iii) sales consummated over the **internet** at internet websites will be deemed to be made at the location of the LPGA licensee (or LPGA, with respect to the **website operated by LPGA**) identified as the seller on the website

(n)     "US Termination Right" shall mean the right of SPI hereto under Section 18(b) hereof.

(o)     "Include" and "including" as used herein means "include without limitation" and "including without limitation."

2.     Appointment of SPI as LPGA's Representative.

(a)     LPGA hereby appoints SPI as LPGA's sole and exclusive representative within the Territory during the Term for arrangement, solicitation, negotiation and presentation, of Licensees and License Agreements subject to Section 2(b).  LPGA grants to SPI authorization to use the Property in connection with licensing activities authorized herein during the Term of this Agreement and any extensions or renewals hereof.

(b)     With respect to its representation rights set forth herein:

>     (i) SPI shall have (A) the **exclusive and sole right to solicit** outside of the United States, except in the automobile category, (B) the exclusive and sole right to solicit for product categories set forth in Exhibit 2(b)(i) within the United States, (C) the non-exclusive right to solicit for all other product categories within the United States, and (D) the non-exclusive right to solicit in the automobile category outside the United States, all for the LPGA's approval, any person, firm, corporation or other entity as a Licensee and negotiate License Agreements in accordance with the terms hereof, including: (I) the licensed use of the Property (limited to merchandising of the Property), (II) the amount of guarantees and other Royalties due under the License Agreements and the terms for payment thereof, (III) the territory (which shall not be more expansive than the Territory hereof), (IV) exclusivity or non-exclusivity in conformance with applicable laws and (V) the term of the License Agreement, including any sell-off period.
SPI and LPGA shall work together in good faith to merchandise the Property, with SPI consulting with LPGA on a regular basis with respect to opportunities which SPI shall pursue, as well as opportunities which SPI has considered but has determined not to pursue.  SPI shall be responsible for servicing the accounts of Licensees (including Square Two) and License Agreements hereunder, including quality control monitoring, collections, reporting and auditing as set forth in this Agreement as SPI has done in prior practice as representative, provided that LPGA shall, in consultation with SPI, have the right to participate in such servicing to the extent LPGA reasonably believes is appropriate;

>     (ii) Following negotiations with a proposed Licensee and before sending a License Agreement to any such Licensee, SPI shall submit to LPGA for LPGA's written approval a completed Contract Requisition Form containing the material terms of the negotiations (a "**Deal Memo**"), in a form set forth in  Exhibit 2(b)(ii);

>     (iii) During the Term, LPGA shall not license, and shall not permit the renewal of any license of, the merchandising of the Property in the Territory either itself or through any representative, licensee or agent, other than SPI; and

>     (iv) LPGA shall refer to SPI all inquiries received during the Term which fall under SPI's exclusive rights hereunder in the Territory.

(c)     On a nonexclusive basis, SPI shall have the option to present to LPGA for its approval proposals for agreements permitting **the use of the Property, other than** merchandising of the property, together with proposals for the division, between SPI and LPGA, of proceeds generated or derived therefrom, but such agreements shall not be deemed to be License Agreements hereunder, and the proceeds of any such agreement, if approved and executed by LPGA, shall not be deemed Royalties hereunder.  The form and terms of such agreements, and the division, between SPI and LPGA, of proceeds generated or derived from such agreements, shall be subject to LPGA written approval.  SPI shall not enter into negotiations with respect to any such agreements, or present itself as authorized to seek such agreements on behalf of LPGA, without prior approval from LPGA

2

(d)     SPI shall have the right to receive, collect, retain and distribute all Royalties in accordance with the terms hereof, and LPGA shall, upon SPI's request, direct each and any Licensee to make payment of such amounts to SPI. LPGA shall promptly pay over to SPI, and account to SPI for, all Royalties it may receive.

(e)     SPI shall have the right to **retain third party representatives** in connection with the performance of its services hereunder, provided that, except as otherwise provided herein, any compensation payable to such third parties shall be the sole responsibility of SPI.

(f)     LPGA shall, upon creation or first use, provide SPI with all new trademarks and logos and revisions of the Property, at which time they shall be included in Exhibit 1(j).

(g)     LPGA shall provide SPI, free of charge, with five VIP licensee **credentials** for use by SPI staff, free of charge, which credentials will provide holders thereof access to any LPGA co-sponsored event. Upon SPI's prior-written request, LPGA shall also provide to SPI, free of charge, **weekly credentials** for each LPGA co-sponsored competition conducted during the Term.

(h)     SPI acknowledges that LPGA has and may continue to have arrangements with third parties under which products displaying the Property are sold over LPGA's internet website, and that such arrangements are permitted hereunder provided that no product displaying the Property shall be sold on LPGA's website except for Licensed Products, and all Licensed Products sold on LPGA's website shall be subject to the terms of this Agreement.
SPI further acknowledges that LPGA may have arrangements which could have the effect of preventing LPGA from selling certain Licensees' products on LPGA's website and/or providing a link from LPGA's website to Licensees' websites. LPGA will provide SPI reasonably prompt notice of such arrangements and will consult with SPI before entering into new ones.

(i)     SPI and LPGA acknowledge that LPGA has signed an Amended and Restated Licensing Agreement between S2 Golf Inc., now known as Women's Golf Unlimited ("Square Two"), and LPGA (the "Square Two Agreement") dated January 1, 1999, that the wording of the Square Two Agreement provides certain exclusive rights with respect to golf clubs to Square Two and that such agreement. expires on December 31, 2003 but includes an option on the part of Square Two to renew through December 31, 2005. Revenues payable by or on behalf of Square Two thereunder after 2001 shall be considered included in Royalties hereunder and the Square Two Agreement shall be part of SPI's servicing responsibilities hereunder.  SPI acknowledges that it does not have the right to negotiate merchandising agreements hereunder providing for golf clubs as Licensed Products which would begin before the expiration or earlier termination of Square Two's rights with respect to golf clubs under the Square Two Agreement.. SPI shall not, without the consent of Square Two: (i) solicit any prospective License Agreements in the golf club category if such License Agreement would violate the Square Two Agreement as the Square Two Agreement may be extended pursuant to the terms thereof, or (ii) commence such solicitation, or present itself as authorized to represent LPGA in the golf club category before the earlier of (A) the termination of Square Two's rights with respect to golf clubs under the Square Two Agreement or (B) a date three months before the expiration of the Square Two Agreement . LPGA will notify SPI promptly of renewal or termination of the Square Two Agreement or termination of any of Square Two's rights with respect to golf clubs thereafter. If Square Two renews the Square Two Agreement as referenced above, LPGA and SPI shall in good faith consider ways in which LPGA will permit SPI to solicit prospective Licensees in the golf club category during 2005.

3.     Consideration.

(a) (i)     **Shares:** SPI shall have the right to receive and retain 50% of Royalties ("SPI's Share"), except that, SPI's Share shall be 40% with respect to Royalties in excess of twice the Final Guarantee Amount (as defined in Section 3(a)(ii))in Section 3(b)(i), as such Guarantee Amount may be adjusted pursuant to the terms hereof. SPI shall remit to LPGA, and LPGA shall retain, the balance of Royalties ("LPGA's Share") in accordance herewith. Royalties shall be apportioned first to recoupment by SPI of any advance payments of LPGA's Share (including Guarantee Payments), then to payments of SPI's Share until SPI's Share and SPI's Share of Royalties are fully paid, and thereafter in proportion to the parties in accordance with their respective shares (for clarity and for avoidance of doubt, it is acknowledged by the parties that Guarantee Payments may not be recouped by SPI until they are actually paid).
    (ii) "Final Guarantee Amount" shall be the Guarantee Amount for December 31, 2012 until SPI loses its right, pursuant to Section 18 (c), to extend this Agreement through that date and shall be calculated assuming that SPI will not exercise its U.S. Termination Right until it does so. SPI shall, within 30 days, make an adjustment payment to LPGA for a reduction in the Final Guarantee Amount that occurs on any date.

(b) (i)     SPI **guarantees** that the cumulative aggregate amount of LPGA's Share shall, from the date of execution hereof through the dates listed below (provided the Term is extended through such dates), equal or exceed the following cumulative amounts ("Guarantee Amounts"):

| | |
|---|---|
| ten days after execution | $20,000.00 |
| December 31, 2000 | $100,000.00 |
| December 31, 2001 | $207,500.00 |
| December 31, 2002 | $687,500.00 |
| December 31, 2003 | $1,167,500.00 |
| December 31, 2004 | $1,667,500.00 |

3

| | |
|---|---|
| March 31, 2005 | $1,808,250.00 (if this agreement is terminated on such date pursuant to Section 18(a)) |
| December 31, 2005 | $2,252,500.00 |
| December 31, 2006 | $2,862,500.00 |
| March 31, 2007 | $3,041,250.00 (if this agreement is terminated on such date pursuant to Section 18(a)) |
| December 31, 2007 | $3,577,500.00 |
| December 31, 2008 | $4,377,500.00 |
| December 31, 2009 | $5,272,500.00 |
| December 31, 2010 | $6,257,000.00 (if SPI exercises its right to extend this agreement under Section 18c) |
| December 31, 2011 | $7,339,950.00 (if SPI exercises its right to extend this agreement under Section 18c) |
| December 31, 2012 | $8,531,195.00 (if SPI exercises its right to extend this agreement under Section 18c) |

Notwithstanding the foregoing, if SPI exercises its U.S. Termination Right, Guarantee Amounts after 2005 shall be as follows:

| | |
|---|---|
| December 31, 2006 | $2,462,500.00 |
| March 31, 2007 | $2,531,250.00 (if this agreement is terminated on such date pursuant to Section 18(a)) |
| December 31, 2007 | $2,737,500.00 |
| December 31, 2008 | $3,052,500.00 |
| December 31, 2009 | $3,412,500.00 |
| December 31, 2010 | $3,808,500.00 (if SPI exercises its right to extend this agreement under Section 18c) |
| December 31, 2011 | $4,244,100.00 (if SPI exercises its right to extend this agreement under Section 18c) |
| December 31, 2012 | $4,723,260.00 (if SPI exercises its right to extend this agreement under Section 18c) |

(ii) In the first calendar year beginning after both of the following events have occurred:

(I) receipt by SPI of notice from LPGA removing Japan from Section 1(m) (i)(I), and

(II) Royalties derived from Licensees in Japan are received (the "Initial Japan Sales Year")

The Guarantee Amount will be increased by LPGA's Share of the amount of Royalties received by SPI in the Initial Japan Sales Year which are generated from sales by Licensees in Japan. In subsequent years such increase shall be further increased by 15% per year. In each year beginning after receipt by SPI of notice from LPGA removing Australia from Section 1(m) (i)(II), the above amounts will be increased by an amount to be negotiated in good faith by the parties.

(iii) To the extent, on any date above, the cumulative amount of LPGA's Share paid by such date does not equal or exceed the Guarantee Amount then due, SPI shall advance to LPGA the difference ("Guarantee Payment"). Guarantee Payments, once made, shall be deemed advance payments of LPGA's Share under Section 3(a) and 3(b) hereof and **recouped** by SPI as specified in this agreement.

(c) The Benchmark-Omni Agreement: within 30 days after execution of this Agreement, LPGA shall report to SPI in writing all amounts received pursuant to the Benchmark-Omni Agreement which have not previously been reported to SPI, and accompanying such report, LPGA shall pay to SPI 15% of such amounts. Thereafter, LPGA shall promptly report to SPI in writing any additional amounts received pursuant to the Benchmark-Omni Agreement, and accompanying such reports, LPGA shall pay to SPI 15% of such amounts.

(d) US Royalties shall be deemed Royalties hereunder to the extent received after 2001.

4. **Royalty Statements and Payments.** On or before the last day of the first month of each calendar quarter during the Term, and, thereafter, on or before the last day of the first month of each calendar quarter in which pertinent amounts are received, paid or incurred:

(a) By SPI: SPI shall furnish to LPGA a full and accurate statement of all Royalties received by SPI, as well as expenses deductible or billable as permitted hereunder incurred, during the preceding calendar quarter. SPI shall have the right to deduct and retain: (i) from LPGA's Share any unrecouped Guarantee Payments or other advance payments of LPGA's Share made to LPGA in order to recoup the portion of LPGA's Share that has been prepaid, and (ii) SPI's Share, before forwarding LPGA's Share for such calendar quarter with the royalty statements. All amounts payable to LPGA shall be paid by check made payable to "Ladies Professional Golf Association", and sent to the attention of the Director of Licensing and Merchandising at the address set forth above.

(b) By LPGA: LPGA shall furnish to SPI, in a form approved by SPI (such approval to be in writing and not to be unreasonably withheld or delayed), a full and accurate statement of all Royalties received by LPGA, if any, from parties other than SPI, accompanied by appropriate payment of such Royalties.

5. License Agreements. The parties hereby agree to the **Form License Agreement** attached hereto as Exhibit 5, other than with respect to Shop-in-shops License Agreements. Changes in such Form shall be subject to LPGA approval. SPI shall submit to LPGA for its execution three copies of each negotiated License Agreement executed by Licensee, each of which shall conform substantially to such Form with such changes and Deal Memo terms as are approved by LPGA. Provided that the License Agreement substantially conforms to the Form with such approved changes and terms, LPGA shall sign all copies of the License Agreement and return all but one copy to SPI for its records and distribution within ten (10) business days following receipt of same.

6.    Quality Control and Approvals.

(a)    SPI acknowledges that if merchandise sold or otherwise distributed by Licensees is of an inappropriate or offensive nature or inferior quality in design, material, appearance or workmanship, the substantial goodwill which LPGA possesses in the Property may be impaired. Accordingly, SPI undertakes that its licensing and merchandising activities will be designed in such a way as to preserve the integrity, character and dignity of LPGA.

(b)    LPGA shall, as soon as reasonably practicable, provide SPI with the **Quality Control Approval Guidelines** and any changes therein. SPI shall conduct on LPGA's behalf quality control reviews and approvals of uses of the Property proposed and submitted by Licensees consistent with the Quality Control Guidelines. Expenses related to ordinary course of business quality control procedures shall be paid by SPI. If LPGA requests a quality control procedure outside the ordinary course of business (e.g., visits to a facility) LPGA and SPI will reasonably agree as to the sharing of costs for such procedures.

7.    Trademark\Copyright Rights & Protection & Enforcement of such Rights.

(a)    SPI acknowledges that all rights to the Property belong to LPGA, and that, except as set forth herein, it is acquiring no rights to the Property. Upon expiration or termination of this Agreement, all right to the Property shall revert to LPGA, except for SPI's right to receive SPI's Share thereafter as provided by this agreement, and SPI shall cease use of the Property at that time.

(b)    SPI agrees not to adopt any trademark or logo that is confusingly similar to any Property unless agreed to by LPGA in its sole discretion.

(c)    SPI agrees not to take any action which will interfere with any of LPGA's rights in and to the Property and not to make any claim nor take any action adverse to LPGA's ownership of the Property.

(d)    All trademark/service mark applications and registrations for the Property shall remain the exclusive property of LPGA, and SPI shall not acquire or convey any ownership or security interest in those applications and registrations. SPI shall not be entitled to register or apply for the registration of any of the Property. In the event SPI has, at LPGA's request, registered or applied for the registration of any of the Property or does so in the future, such applications or registrations shall become the property of LPGA and SPI will execute all documents and instruments necessary or desirable to assign or otherwise transfer the ownership of said applications or registrations to LPGA at LPGA's expense.

(e)    LPGA shall, when reasonably requested and at least quarterly, provide SPI with a copy of LPGA's **trademark application and registration docket** for all Property detailing the status of LPGA's registrations and applications worldwide. LPGA has provided SPI with the most recent version thereof.

(f)    SPI agrees to notify LPGA if SPI becomes aware of (i) any uses of or any application or registration for a trademark, service mark or trade name or logo that conflicts with or is confusingly similar with any of the Property; (ii) any acts of infringement or unfair competition involving any of the Property or (iii) any allegations or claims, whether or not made in a lawsuit, that the use of any of the Property by a Licensee infringes the trademark or service mark or other rights of any other entity.

(g)    Upon receipt of notice of infringing activity from any third party which may affect merchandising of the Property, LPGA shall notify SPI of such infringement and shall take whatever action it, in its good faith discretion, deems necessary or desirable to protect the validity and strength, or prevent the use, infringement and/or registration by others, of the Property. In determining what action is appropriate, LPGA and SPI shall take into consideration LPGA's costs of taking such actions, the nature and extent of the infringement, the importance of the country in which the infringement is occurring and the potential revenue loss (including loss of sales and damage to the marketability of the Property) caused by the infringing activity.

(h)    In the event an action or claim is filed by LPGA against an alleged infringer of the Property in the Territory, SPI agrees to cooperate and assist in any such action or matter at LPGA's request if deemed necessary or desirable by LPGA in connection with any action with respect to the Property that LPGA may choose to take. Damages and settlement amounts for unauthorized merchandising activity received as a result of such actions shall, after deduction and repayment of litigation costs (including attorney fees), be deemed to be Royalties hereunder.

(i)    In the event **LPGA elects not to prosecute or defend** the Property against SPI's recommendation, SPI shall have the right, but not the obligation, to institute appropriate actions against the infringer. LPGA shall cooperate and assist SPI in the prosecution of such action and SPI shall keep LPGA advised of the progress of such action. SPI shall be entitled to use counsel of its own choice at its expense, in consultation with LPGA, and SPI and LPGA shall be entitled to receive and retain, from any recovery obtained in connection with such actions, their respective litigation costs, including reasonable attorneys fees. SPI shall be entitled to retain and receive 75% of the remainder thereof with respect to any recovery or portion thereof attributable to infringing merchandising of the Property, with the remainder of any such recovery or portion thereof which is attributable to infringing merchandising of the Property

deemed Royalties hereunder. SPI shall keep LPGA informed of all its efforts in protecting and enforcing the Property and provide LPGA with copies of all communications, pleadings and other documents.

Case 1:07-cv-10417-LBS   Document 22   Filed 10/16/2007   Page 7 of 22

(j)       In the event of any protection, enforcement or litigation proceedings or actions by either party as permitted hereunder, the parties shall cooperate with one another and shall make all reasonable efforts to agree on strategy, procedures or other steps to be taken. Except with respect to actions referred to under Section 7(i) hereof, in the event the parties, after reasonable efforts, are unable to agree, then LPGA shall have control over all the decisions except for the amount, schedule and form of monetary recovery in which event both parties must reasonably agree. No action or proceeding or claim hereunder shall be settled, compromised or otherwise disposed of without the prior written consent of LPGA and SPI, which consent will not be unreasonably withheld or delayed. SPI's recovery will be limited to its costs and a share of damages reasonably attributable to merchandising infringement.

8.       Collections and Audits of Licensees.

(a)       SPI shall use reasonable efforts, not including litigation, as SPI shall reasonably deem appropriate, to collect monies which may be past due under License Agreements. Any reasonable out-of-pocket costs, approved by LPGA, incurred by SPI in collecting such sums shall be shared by the parties.

(b)       SPI shall have the right and authority to conduct audits of Licensees and to negotiate the settlement of any such audits or past due amounts in such manner as SPI reasonably believes will result in the greatest likelihood of obtaining monies past due. LPGA shall be given advance notice of any such audit and provided the opportunity to attend at LPGA's expense. If SPI elects to employ outside auditors in connection with any such collection efforts, the costs of such auditors approved by LPGA , to the extent not reimbursed by the Licensee, shall be shared by the parties.

(c)       Costs under this Section shall be shared by the parties in the same proportion as their respective shares of Royalties for the quarter in which they were incurred without regard to Guarantee Payments (i.e., ranging from 50-50 to 40-60). SPI shall invoice LPGA for its share of such costs, in which case LPGA shall remit payment within thirty (30) days of such invoice.

9. [deleted]

10.       SPI Books and Records.   SPI agrees to keep accurate books of account and records covering all transactions relating to this Agreement. LPGA and LPGA's duly authorized representatives shall have the right, at LPGA's cost and upon reasonable prior written notice, but no more than once a year for a maximum period of three (3) days, during reasonable business hours and without interference with SPI's normal business activities, to examine and copy all such books and records, and all other documents and materials in the possession or under the control of SPI with respect to the subject matter and terms of this Agreement, and shall have free and full access thereto for such purposes, insofar as they relate solely to the purpose of verifying all Royalty Statements and all reimbursable expenses incurred by SPI hereunder. All books of account and records shall be kept available for at least six years after entry. If an audit discloses excess payments to LPGA, LPGA shall refund such amount to SPI. In the event that an audit conducted pursuant to this Section reveals that the amounts paid by SPI is lower than the amounts actually due pursuant to this Agreement, then SPI shall promptly pay to LPGA an amount equal to the difference between the amounts due pursuant to this Agreement and the amounts actually paid by SPI as revealed by the audit (the "Discrepancy Amount"). In the event the Discrepancy Amount is greater than ten percent (10%), SPI shall reimburse LPGA an amount equal to the reasonable cost of performing the audit.

11.       LPGA Representations, Covenants and Warranties. LPGA represents, warrants and covenants to SPI as follows:

(a)       LPGA has, and will have throughout the Term, the sole and exclusive right to grant the rights granted to SPI within the Territory and to perform fully all of its obligations and agreements herein, including the right to enter into License Agreements;

(b)       LPGA is and shall be the sole and exclusive proprietor, or exclusive licensee throughout the Territory, of the Property;

(c)       There is no action, suit or claim pending relating to the validity of LPGA'S rights in and to, or ownership of, the Property in any jurisdiction within the Territory;

(d)       (i) LPGA has and shall maintain during the Term **trademark registrations** for the Property in the countries and classes within the Territory listed in Exhibit 11(d)(i); (ii) LPGA has filed trademark applications (or applications have been filed on its behalf) for the Property in the countries and classes within the Territory listed in Exhibit 11(d) (ii); (iii) on or before the date(s) specified in exhibit 11(d)(iii), LPGA will file trademark applications (or applications will be filed on its behalf) for the LPGA Logo in the countries and classes within the Territory listed in Exhibit 11(d)(iii). LPGA shall file trademark applications, upon reasonable request of SPI, as are reasonably necessary hereunder for SPI's licensing activities hereunder and for protection of the Property against piracy. LPGA shall use its best efforts to cause applications to mature into trademark registrations . Such best efforts shall include standard registration costs for each country, class and mark. As used herein, "standard registration costs" shall mean government trademark office costs and fees and related reasonable counsel and agent fees and costs which are routinely paid in connection with uncontested registrations. However, LPGA's total third-party out-of-pocket registration costs, in excess of standard registration costs may, at LPGA's option, be limited to

6

to License Agreements with respect to such country or (B) Royalties actually received from Licensees with respect to such country. If, in any case, it is unclear how much guarantees or royalties are derived from a country, the apportionment shall be made based on national GDP as reported most recently by the US Department of State. Notwithstanding the foregoing, SPI may, with and to the extent of LPGA's prior written consent, endeavor to effect registrations of the Property and incur and pay any or all costs and expenses thereof, in which case such costs, to the extent they are reasonably documented to LPGA, shall, at SPI's election but also with LPGA's prior written consent, be deemed (A) payments of Guaranteed Amounts hereunder; or (B) additions to, and payments of, Guaranteed Amounts hereunder.

(e)     LPGA shall take reasonable measures to aggressively enforce and protect its trademarks against infringements in the Territory;

(f)     Except as specified in Section 11(k), LPGA has not in any way encumbered, nor permitted the encumbrance, nor will it so encumber or permit the encumbrance of rights in the Property in the Territory;

(g)     The use of the Property as herein contemplated throughout the Territory does not and shall not infringe upon or violate the right of privacy of, or right of publicity of, or constitute a libel or slander against, or defame, or violate any copyright, trademark, service mark, common law or other right, contractual or otherwise, of any period, entity or corporation or violate any law;

(h)     LPGA has obtained, or shall obtain, powers of attorney, or cooperation of owners of portions of the Property, if any, necessary to register, enforce, maintain and protect the Property in the Territory; and

(i)     LPGA shall take all steps reasonably necessary to conform the Form License Agreement to local laws in the Territory. SPI and LPGA acknowledge that it may be desirable to notify the EU Commission of one or more License Agreements, as specified by regulations promulgated under The Treaty of Rome §85 with respect to trademark and copyright license agreements and that such filings may be required to enforce certain territorial restrictions imposed upon Licensees. SPI and LPGA shall agree whether to make such filings, and SPI and LPGA shall agree as to the sharing of the costs of such filings. LPGA and SPI shall cooperate and act diligently and prudently in conforming their activities and contracts to local laws and in effecting any governmental filings and notifications that are necessary.

(j) This Agreement does not and shall not conflict, violate or interfere with any other contractual relationships between LPGA and any third party. LPGA shall, as soon as reasonably feasible, inform SPI in writing of the existence of any agreements or actions:

(i) permitting use of the Property outside of the United States, or
(ii) permitting merchandising of the property in the United States, or
(iii) appointing National Marketing Partners, or other appointments and arrangements of similar stature, in each case, together with descriptions of the permitted uses and merchandising, and the countries and territories which they cover in the Territory. LPGA shall notify SPI reasonably promptly of commencement of negotiations of agreements permitting merchandising of the Property.

(k) LPGA will not permit and has not permitted anyone (whether a licensee, national marketing partner, sponsor or any other person or entity) to merchandise (as defined in Section 1(e)) the Property outside of the United States or in the exclusive product categories (set forth on exhibit 2(b)(i)) within the United States, and merchandising pursuant to this agreement will not be restricted, except as follows:

(i) entities will or may have merchandising rights for the territories and products as specified in exhibit 11(k)(i) up to and not beyond the dates listed in that exhibit. Those rights will end on the dates indicated and will not be renewed . With respect to Anheuser-Busch: Michelob Light, SPI acknowledges that the LPGA will renew the Anheuser-Busch: Michelob Light sponsorship, which will not include merchandising rights outside of the United States or in such exclusive product categories within the United States, and which will not restrict merchandising pursuant to this agreement;

(ii) worldwide with respect to the automobiles category;

(iii) tournament sponsors are permitted to put the Property on the bulleted items on listed on exhibit 11(k)(iii); and

(iv) pursuant to Deal Memos and contracts submitted by SPI under this representation agreement or otherwise consented to in writing by SPI

Notwithstanding the foregoing, SPI acknowledges that, because of contractual wording providing for promotional use of the property by tournament sponsors, merchandising of the Property in the United States by such tournament sponsors in the exclusive categories listed on exhibit 2(b)(i), while not anticipated, may occur through the end of 2002. Such uses during such period will not be a breach of this agreement.

(I)     As between the parties hereto, SPI shall be deemed a named and intended third party beneficiary of all License Agreements in effect as of the time hereof, and SPI and LPGA shall provide reasonable cooperation to each other in the enforcement of such agreements and all License Agreements executed hereunder.

12.     SPI's Representations, Warranties and Covenants.  SPI hereby represents, warrants and covenants to LPGA the following:

        (a)     SPI has the right to enter into this Agreement and perform fully all of its obligations and agreements hereunder, and SPI is not a party to any other contract or agreement, or any other restriction or prohibition of any nature that would prohibit it from entering into this Agreement and performing its obligations hereunder.

        (b)     SPI is a duly organized limited liability company in good standing under the laws of the State of Delaware.

        (c)     SPI will reasonably comply with all applicable laws, rules, regulations and ordinances of every jurisdiction in which it performs its obligations or exercises its rights under this Agreement.

13.     Indemnification.

        (a)     LPGA shall assume liability for, and shall indemnify, defend, protect, save and hold harmless SPI, each partner therein and division thereof, and its parent, subsidiary and affiliated divisions and companies and assigns, and their respective partners, shareholders, directors, officers, employees and agents (the "SPI Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses whether incurred in preparation for trial, at trial, on appeal or in any insolvency proceeding) of whatsoever kind and nature imposed on, incurred by or asserted against any of the SPI Indemnified Parties arising out of any use of the Property in accordance with this Agreement and any breach by LPGA of any representation, warranty or covenant made by LPGA herein.  The provisions of this Subsection shall apply, without limitation, to claims brought by SPI against LPGA in enforcing the terms of this Agreement.

        (b)     SPI assumes liability for, and shall indemnify, defend, protect, save and hold harmless LPGA, its members, directors, officers, employees, agents and affiliated companies (the "LPGA Indemnified Parties") from and against any and all claims, actions, suits, costs, liabilities, judgments, obligations, losses, penalties, expenses or damages (including, without limitation, legal fees and expenses whether incurred in preparation for trial, at trial, on appeal or in any insolvency proceeding) of whatsoever kind and nature imposed on, incurred by or asserted against any of the LPGA Indemnified Parties arising out of SPI's performance under this Agreement, other than as approved by LPGA and other than with respect to its actions with respect to LPGA as permitted hereunder and any breach by SPI of any representation, warranty or covenant made by SPI herein.  The provisions of this Subsection shall apply, without limitation, to claims brought by LPGA against SPI in enforcing the terms of this Agreement.

        (c)     In order to seek or receive indemnification hereunder in cases involving third-party claims:

                (i)     the party seeking indemnification (the "Indemnitee") must have promptly notified the other (the "Indemnitor") of any claim or litigation of which it is aware to which the indemnification relates; and

                (ii)    with regard to any claim or litigation to which the Indemnitor itself is not a party, the Indemnitee must have afforded the Indemnitor the opportunity to participate in any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

        (d)     Each party consents to, and shall not object to, jurisdiction in impleader (or similar) actions or filings against them in which the pertinent claim makes an allegation which, if true, would constitute a breach of this agreement by such party.

14.     Relationship of Parties.  SPI shall render all services hereunder as an independent contractor.  Nothing herein contained shall be construed to place the parties in the relationship of partners, joint venturers, principal and agent, or fiduciaries, and neither party shall have any right or power to obligate or bind the other in any manner whatsoever except as authorized in this Agreement or otherwise specifically authorized in writing.

15.     Rights on Termination or Expiration.  Upon termination or expiration, all rights of SPI will terminate; except, that SPI shall continue to receive and retain all amounts which it is entitled to receive or retain hereunder with respect to License Agreements existing on the date of termination hereof for a period of three years following expiration or termination of this Agreement including any extension, renewals, modifications or substitutes and, in addition, 30% of such amounts for one (1) additional year thereafter, except as otherwise provided in this Section.  If SPI exercises its US Termination Right hereunder, all rights of SPI with respect to US Royalties due after 2005 shall cease.  If in any case it is unclear whether Royalties are or are not US Royalties, the parties shall in good faith attempt to agree to a reasonable apportionment thereof based on all relevant facts and circumstances, and if the parties are unable to so agree after

good faith negotiations, the apportionment shall be made on the basis of national GDP, as reported by the US Department of State, provided that 60% of such Royalties shall be deemed US Royalties in the case of a worldwide license.

16.      Events of Default; Rights and Remedies.

(a)      The occurrence of any one or more of the following events prior to the expiration of the Term shall constitute an "Event of Default" hereunder:

(i)  Default in the payment of any sum becoming due under this Agreement, which default continues for 30 days after written notice thereof to the defaulting party;

(ii)  Default in the performance or observance of any of the material non-monetary terms, agreements, covenants or conditions of this Agreement, which default continues for thirty (30) days after written notice thereof, unless the cure of such default has begun but cannot by its nature be completed within the thirty (30) day period;

(iii)  The application by either party hereto for, or consent to, the appointment of a receiver, trustee, liquidator or custodian (or similar official) of it or of all or a substantial part of its assets, or if either party (or its corporate parent) shall (A) be unable or admit in writing its inability to pay its debts as they mature, (B) make a general assignment for the benefit of creditors, (C) be adjudicated a bankrupt or insolvent, (D) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or any arrangement with creditors or to take advantage of any insolvency law, (E) file an answer admitting the material allegations of a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, or (F) if any corporate action shall be taken by it for the purpose of effecting any of the foregoing; or if an order, judgment or decree shall be entered by any court or tribunal of competent jurisdiction approving a petition seeking reorganization or appointing a receiver, trustee, liquidator or custodian (or other similar official) of either party hereto (or its corporate parent) or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of thirty (30) consecutive days;

(iv)  Any material representation or warranty contained in this Agreement shall be false or misleading in any material respect and remains uncured for thirty (30) days after written notice thereof.

(b)      Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to terminate this Agreement and, in addition thereto, shall be entitled to any and all remedies available at law or equity.

17.      Confidentiality. Neither SPI nor LPGA shall disclose to any third party (other than its respective officers, directors and employees, in their capacity as such), any information respecting the terms of this Agreement (other than the rights granted to SPI hereunder) except: (a) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event the party making such disclosure shall seek confidential treatment of such information; (b) as part of its normal reporting or review procedure to its partners, parents, auditors and attorneys (and said partners, parents, auditors and attorneys agree to be bound by the provisions of this Section) and (c) in order to enforce its rights hereunder in a legal proceeding.

18.      Renewal/Early termination.

(a)      SPI may terminate this agreement as of March 31, 2005 by notice given on or before January 31, 2005. SPI may extend this agreement as it is in effect as of June 30, 2006 through December 31, 2009 by notice given on or before September 30, 2006.

(b)      The United States of America, its territories and possessions may be deleted from the Territory as of December 31, 2005, except with respect to Royalties and other payments due before 2006, by SPI by written notice given LPGA on or before June 30, 2005.

(c)      Provided that: (i) SPI is not in breach of this Agreement, (ii) this Agreement has not earlier been terminated in accordance with Sections 15, 16 or 18 and (iii) SPI has recouped SPI's Share of Royalties through 2008, SPI and the LPGA agree that SPI shall have the option to extend this Agreement through December 31, 2012 under the same terms and conditions  SPI must deliver written notice of its intent to exercise this option by no later than February 1, 2009.

19.      [deleted]

20.      Miscellaneous.

(a)      Notices.  All notices and other communications between the parties hereto shall be in writing and deemed received (i) when delivered in person or by overnight delivery service, messenger, telefax or electronic (e.g., email) means, or (ii) five (5) days after deposit in the United States mails, postage prepaid, certified or registered mail, addressed to the other party at the address set forth below or at such other address as such other party may supply by written notice). Notices delivered by telefax or electronic means must be confirmed by mail to be effective.

TO LPGA:

Ladies Professional Golf Association
100 International Golf Drive
Daytona Beach, FL 32124
Attention:
Director of Licensing and Marketing
phone: 386-274-6200
fax: 386-274-1099
email: sharlene@lpga.com

with copy to:

Ladies Professional Golf Association
100 International Golf Drive
Daytona Beach, FL 32124
Attention: Chief Legal Officer
phone: 386-274-6200
fax: 386-274-1092
email: libbag@lpga.com

TO SPI:

SUMMIT PROPERTIES INTERNATIONAL, L.L.C.
600 Third Avenue
New York, NY 10016
Attention: General Counsel
phone: 212-490-1100
fax: 212-682-5191
email: spiusa@i-2000.com

(b)    Approvals    LPGA agrees not to unreasonably withhold or delay any approval or consent hereunder, provided however, SPI acknowledges that LPGA may and shall be entitled to deny approval or consent based upon factors other than monetary return, such as the impact on the image and reputation of LPGA. In case of disapproval, LPGA shall provide SPI with a written memo indicating the reasons for LPGA's disapproval in detail reasonably calculated to guide SPI (and, where applicable, a Licensee) in formulating or finding an acceptable replacement or alternative and in assessing future prospects and actions.

-LPGA agrees to notify SPI of its approval, consent or denial thereof in writing within ten (10) days after receipt of a submission by SPI

-In the event LPGA fails to so notify SPI within ten (10) days, LPGA's lack of response shall be deemed an approval or consent.

(c)    Further Documents. Each party hereto shall execute any and all further instruments which either party hereto may deem reasonably necessary and proper to carry out the purposes of this Agreement.

(d)    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, applicable to contracts entered into and to be fully performed therein.

(e)    Assignments. This Agreement may not be assigned by LPGA or SPI, either voluntarily or by operation of law, without the prior written consent of the other and any attempted assignment shall be void. SPI will give LPGA prompt written notice if and when the aggregate voting control of the Wang and Holmes families in SPI (or an entity controlling SPI or into which SPI merges) falls below 50%. LPGA will have 90 days from the date of such notice in which to terminate this agreement by written notice to SPI.

(f)    Survival.

(i) All representations, warranties and indemnities contained herein or made by SPI and LPGA in connection herewith and the provisions of the Confidentiality Section hereof, shall survive the execution, delivery, suspension, expiration and termination of this Agreement or any provision hereof.

(ii) The provisions of Sections 4, 8, 10, 13, 15 and 20 shall survive the expiration of this Agreement or until the latest date on which expires any License Agreement hereunder.

(g)    Captions. The titles of the Sections of this Agreement are for convenience only and shall not in any way affect the interpretation of this Agreement.

(h)    No Waiver.  No waiver of any term or condition of this Agreement shall be construed as a waiver of any other term or condition; nor shall any waiver of any default under this Agreement be construed as a waiver of any other default.

(i)    Merger.  This Agreement constitutes the entire agreement between LPGA and  SPI with respect to the subject matter contained herein, replaces and supersedes all previous agreements and understandings whether written or oral pertaining thereto, and may be changed or modified only by an agreement in writing signed by LPGA and  SPI.  There are no representations or undertakings other than those contained in this Agreement.

(j)    Incorporation.  All Exhibits and Schedules to this Agreement are hereby incorporated herein and made a part hereof.

(k)    No Third Party Beneficiaries.  Except as expressly provided to the contrary, this Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.
Ladies Professional Golf Association

By: _____

Ty M. Votaw, Commissioner

Date:

SUMMIT PROPERTIES INTERNATIONAL, L.L.C.

By: _____

Title: _Chairman_____

Date: _11/4/02_____

List of schedules/ exhibits:
1(j)  - Property (Marks/logos of LPGA)
2(b)(i) – Exclusive Product Categories (within the United States)
2(b) (ii) - Form of Deal Memo
5 - Form of License Agreement
11(d) (i) - Existing registrations
11(d) (ii) - Pending filings
11(d) (iii) - Applications to be filed
11(k) (i) - Existing Merchandising Arrangements Outside Of The US And In The Exclusive Categories Within The US
11(k) (iii) - Tournament Sponsor Obligations

11



## LOGO COLOR SPECIFICATIONS

The approved colors for reproducing the LPGA logo are:



PMS 3435   (green)
PMS 871    (gold)
    or
BLACK



The accepted color combinations are shown on this sheet. A gold foil application is also acceptable.

For detailed clarification of these specifications or for permission to use color combinations other than these shown, please contact Carol Kilian, Manager of Creative Services at LPGA Headquarters 904/274-6200.







































# Logo Specifications

This logo sheet is provided for use in the quality reproduction of the LPGA INTERNATIONAL logo. The approved colors for reproducing this logo are:

PMS 281 (blue)
PMS 871 (gold)
or
BLACK

The approved color combinations are shown below. A gold foil application is also acceptable.

For detailed clarification of these specifications or for permission to use color combinations other than those shown, please contact Carol Kilian, Manager of Creative Services, LPGA Headquarters at 904/254-8800.



































# LPGA
# LPGA TOUR
# LPGA INTERNATIONAL

EXHIBITS 2(b)(i)

## Exclusive Product Categories
### (within the United States)

- *Apparel* (including hosiery, rainwear, headwear, belts, swimwear, outerwear, sportswear and footwear)
- *Golf Clubs and accessories*
- *Golf Balls*
- *Golf teaching devices*
- *Sunglasses and Eyewear*
- *Luggage*
- *Office products* (excluding computers or office product retailers like Office Depot)
- *Home and office furniture*
- *Desk accessories* (excluding writing instruments)
- *Golf Memorabilia and Collectibles*
- *Publishing*
- *Games* (including electronic games for resale and board games)
- *Cosmetics and Sun Lotion* (excluding other lotions, shaving cream, shampoo and conditioner)
- *Jewelry* (excluding timepieces)
- *Linens and towels*
- *Personal accessories* (including wallets, purses, key holders and cellular phone holders)
- *Kitchen and dining ware* (including cooking ware, plates, glassware, cups and utensils)
- *Toys, figures and figurines*

**LPGA®**

### DEAL REQUISITION

Date:

A/E:

The following is a summary of terms that SPI plans to submit to LPGA for its evaluation. If accepted by LPGA, we will send you a contract incorporating these terms and standard terms of LPGA's trademark license agreement, but LPGA does not permit use of its trademarks except pursuant to a signed license agreement.

[licensee name] ("Licensee")
Address:
[licensee address- street]
[licensee city, state]
[licensee country]

Phone: [licensee phone]   fax: [licensee fax]   email: [licensee email]
Contact: [contact name]
Website url: [website url]

Term beginning [start date] (the "Effective Date") and ending on [end date]

Marketing Date:
Licensed Marks: LPGA word mark☐; LPGA logo☐
Licensed Product(s):

Territory:

Guarantee/ Minimum Consideration: [total guarantee installments]
Payable as follows:

Royalty Rate/Additional consideration: [royalty rate]

Alterations to standard agreement (if any)(e.g., renewal, exclusivity (as to period/products/territory), etc.):

Approvals:

Representative: _____ AE: _____ Legal: _____ President: _____

LPGA _____

## LICENSING AGREEMENT

Ladies Professional Golf Association.("Licensor") c/o Summit Properties International ("SPI"), 600 Third Avenue, 22nd Floor, New York, NY 10016 (phone: 212-490-1100 (after hours: 212-682-5192); fax: 212-682-5191; email: spiusa@i-2000.com; contact: General Counsel) and

[licensee name] ("Licensee")
[licensee address- street]
[licensee city, state]
[licensee country]

Phone: [licensee phone] Fax: [licensee fax] Email: [licensee email]

Contact: [contact name]

agree as follows:

For the Term beginning as of [start date] (the "Effective Date") and ending [end date] and subject to the Standard Terms and Conditions attached hereto, all of which are incorporated herein by reference and made a part hereof, Licensor grants to Licensee a QX[non-exclusive] license to utilize the Marks solely upon or in connection with the manufacture, distribution and retail sale of the Licensed Products throughout the Territory, as defined and specified below:

Marks:                LPGA™ trademarks of Licensor depicted in Schedule A to be used in compliance with Licensor's
                      Graphic Standards Manual.

Licensed Products:

Marketing Date:

Territory:

Royalty Rate:          [royalty rate] of Net Invoiced Billings, as defined in the terms and conditions appended hereto

Guaranteed Consideration:    Total Minimum Guarantee: [total guarantee install]
Payable as follows:

    [advance - 1st guar instal] (the **advance**) on the date this Agreement is returned to Licensee, executed by Licensor      [3d guar ] by [3d guar date words]
[4th guar ] by [4th guar date words]
[1st guar (after adv, if any)] by [1st guar date words]    [5th guar ] by [5th guar date words]
[6th guar ] by [6th guar date words]
[2nd guar] by      [etc.]

Payments are to be made by wire transfer to:

THE BERKSHIRE BANK NEW YORK, NY 10022; ABA 026011921; A/C SUMMIT PROPERTIES INTERNATIONAL;
A/C No. [_____]

or in such other manner or to such other bank and account as specified by written notice to Licensee.

First royalty statement due:      30th day of the month following the first calendar quarter ending after the Effective Date.

ALL USES OF THE MARKS MUST BE APPROVED IN WRITING BY LPGA OR SPI.

AT TIMES SPECIFIED IN THE TERMS AND CONDITIONS, PERIODIC ROYALTY REPORTS ARE REQUIRED TO BE SENT TO SPI REGARDLESS OF AMOUNT (OR LACK) OF SALES.

[for negotiated changes to the standard terms and conditions, if any:
The Terms and Conditions attached hereto are amended as follows: ]

[for delivery of samples to foreign offices: Samples of products to be delivered pursuant to paragraphs 5.4 and 7.11 of the Standard Terms and Conditions attached hereto shall be delivered to:
   [representative office address]

[to be added for exclusive licenses for certain products within the EEA: Licensor hereby undertakes that during the Term and any extension thereof it will not itself use or grant any further licenses to use the Marks on

[Product] in the following territories:　　　　　　]

[withholding tax waiver]
Section 2.1 of the standard terms is amended to provide that all payments are subject to withholding tax on royalty payments made to entities outside of [_____], provided that the licensee shall provide all reasonably requested assistance in obtaining refunds and credits of such tax, including execution and delivery to licensor ( or as otherwise directed by the licensor) of appropriate certificates and other documentation requested by Licensor or SPI.

[for non-eu licenses:] Unless and until a nation in the European Union is added to the Territory hereunder, Paragraph 1.2.1 and the phrase, "that is located in a non-EEA country" in paragraph 11.2, of the Terms and Conditions shall be deleted.

By signing below, Licensee: (i) affirms that it is in agreement with the foregoing and that it has read and understands and agrees to be bound by the Terms and Conditions [(as modified above)] attached hereto and forming part hereof and to comply with all applicable laws and regulations; (ii) agrees that this Agreement shall also serve as an invoice to Licensee with respect to the amounts payable as set forth above and Licensee agrees to pay such amounts to Licensor as and when specified above; and (iii) acknowledges and represents that this agreement is a full statement of the obligations of the parties with respect to the matters set forth herein and that it is not relying on any communication from Licensor or SPI other than as set forth in this Agreement and in the documents specifically referenced therein.

This Agreement shall not be binding upon Licensor unless and until (i) it is fully executed and delivered to Licensee and (ii) Licensor receives from Licensee the advance and letter of credit, if any, indicated above.

AGREED AND ACCEPTED:

[licensee name]                                         Ladies Professional Golf Association

By: _____                          By: _____

Title: _____                       Title: _____

Date: _____                        Date: _____

## SCHEDULE A
## MARKS

# Logo Specifications

This logo sheet is provided for use in the quality reproduction of the LPGA INTERNATIONAL logo. The approved colors for reproducing this logo are:

    PMS 281 (blue)
    PMS 871 (gold)
        or
    BLACK

The approved color combinations are shown below. A gold foil application is also acceptable.

For detailed clarification of these specifications or for permission to use color combinations other than those shown, please contact Carol Kilian, Manager of Creative Services, LPGA Headquarters at 904/254-8800.

































# LPGA Logo Sheet





## Logo Color Specifications

The approved colors for reproducing the LPGA logo are:

PMS 3435 (green)
PMS 871 (gold)
or
**BLACK**

The accepted color combinations are shown on this sheet. A gold foil application is also acceptable.

For detailed clarification of these specifications or for permission to use color combinations other than these shown, please contact Carol Kilian, Manager of Creative Services at LPGA Headquarters 904/274-6200.







































LPGA 1096

# LPGA Logo and Product Label Color Specifications

The LPGA logo and product label should be reproduced in PMS 3435 green whenever possible. For clarification or permission to use another color, please contact Carol Kilian, LPGA manager of creative services at 904-274-6200.








lpga 1.99

# LPGA
## LPGA TOUR
# LPGA INTERNATIONAL

SCHEDULE B

## LETTER OF UNDERTAKING FROM NON-AFFILIATE MANUFACTURER

QX (to be addressed to Licensee)

We, _____ ("Manufacturer"), as supplier of [Licensee] ("Licensee"), acknowledge that we have been made fully aware of Licensee's obligations under the License Agreement between Ladies Professional Golf Association ("Licensor") and Licensee dated as of QX__ 199__ and expiring on qx_____ with regard to the licensing of products bearing the Ladies Professional Golf Association trademarks and copyrights ("Marks"). Licensee has engaged us to manufacture the following Licensed Products:

manufactured at the following address(es):

In order to enable Licensee to comply with its obligations under the said Agreement and to protect Licensor's rights, we hereby undertake not to sell the Licensed Products to any party whatsoever other than Licensee or otherwise exploit them commercially either directly or indirectly. We hereby expressly renounce any and all intellectual and industrial property rights in or in connection with the Licensed Products.

We hereby further undertake (a) not to re-use the Licensed Products for any purpose whatsoever, and (b) to destroy immediately all Licensed Products remaining in stock on the expiration or earlier termination of our agreement with Licensee, and in any case not later than 90 days after the expiration date specified above.

We acknowledge Licensor's and your unfettered right to manufacture or have manufactured for Licensee or others any product which is the same or substantially similar to the Licensed Products.

We acknowledge your right and Licensor's right at any time to conduct an audit of our accounts and other records, and to inspect our premises to satisfy Licensor and yourself of the due observance of your obligations to Licensor and our full compliance with this Letter of Undertaking.

We hereby undertake not to (i) incorporate or include our own name or our own trademarks in or on the Licensed Products or its packaging; (ii) use the Marks on any business sign, business cards, stationary items, advertisement, promotional material, point of purchase, or other similar material; (iii) use the Marks as the name of our business or any division thereof; (iv) imply that we have any association or official status with the Ladies Professional Golf Association by using advertisements, promotional material, point of purchase, or any other similar material; or (v) use the Marks on any products other than the Licensed Products without the written consent of Licensor or Licensee's written instruction stating that its contract has been amended to include such products as Licensed Products.

We acknowledge that Licensor is a third-party beneficiary of our agreement with Licensee and of this Undertaking. We agree to hold harmless, defend and indemnify Licensor and Summit Properties International from any claims arising from the manufacture, shipment, sale or distribution of Licensed Products, or between Manufacturer and Licensee in connection with the Licensed Products. We further acknowledge Licensor's right to terminate our manufacture of the Licensed Products in the event of a breach hereof by us.

5

In the event that the terms of this agreement with Licensee are amended in any respect, including without limitation the addition of Licensed Products or change in place of manufacture, we shall re-execute a new version of this undertaking amended accordingly.

[Manufacturer]

By: _____

Title: _____
Date: _____

SCHEDULE C
## LETTER OF UNDERTAKING FROM NON-AFFILIATE DISTRIBUTOR

qx

We, _____ ("Distributor"), as distributor of qx ("Licensee"), acknowledge that we have been made fully aware of Licensee's obligations under the License Agreement between Ladies Professional Golf Association ("Licensor") and Licensee dated as of qx and expiring on qx with regard to the licensing of products bearing the Ladies Professional Golf Association and certain Tournament trademarks and copyrights (the "Marks"). Licensee has engaged us to distribute the following Licensed Products:

in the following "Territory":

In order to enable Licensee to comply with its obligations under the said Agreement and to protect Licensor's rights, we hereby undertake to comply with all applicable provisions of such Agreement. We hereby expressly renounce any and all intellectual and industrial property rights in or in connection with the Licensed Products.

We hereby further undertake (a) not to seek customers or to establish a branch or maintain a distribution depot outside the territories specified above; (b) not to solicit, sell or distribute the Licensed Products to any person or entity outside of the contract "Territory" listed above; (c) not to distribute Licensed Products after the expiration or earlier termination of our agreement with Licensee, and in any case not later than 90 days after the expiration date specified above, and (c) to destroy immediately all Licensed Products remaining in stock on the expiration or earlier termination of our agreement with Licensee, and in any case not later than 90 days after the expiration date specified above

We acknowledge Licensor's unfettered right to distribute through yourself or through others any product which is the same or substantially similar to the Licensed Products.

We hereby acknowledge your right and Licensor's right at any time to conduct an audit of our accounts and other records, and to inspect our premises to satisfy Licensor and yourself of the due observance of your obligations to Licensor and our full compliance with this Letter of Undertaking.

We hereby undertake not to (i) incorporate or include our own name or our own trademarks in or on the Licensed Products or its packaging; (ii) use the Marks on any business sign, business cards, stationery items, forms, advertisement, promotional material, point of purchase, or other similar material; (iii) use the Marks as the name of our business or any division thereof; (iv) imply that we have any association or official status with the Ladies Professional Golf Association or any Tournament by using advertisements, promotional material, point of purchase, or any other similar material or (v) use the Marks on any products other than the Licensed Products without the written consent of Licensor or Licensee's written instruction stating that its contract has been amended to include such products as Licensed Products.

We acknowledge that Licensor is a third-party beneficiary of our agreement with Licensee and of this Undertaking. We agree to hold harmless, defend and indemnify Licensor and Summit Properties International from any claims arising from the manufacture, shipment, sale or distribution of Licensed Products, or between Manufacturer and Licensee in connection with the Licensed Products. We further acknowledge Licensor's right to terminate our distribution of the Licensed Products in the event of a breach hereof by us.

In the event that the terms of this agreement with Licensee are amended in any respect, including without limitation the addition of Licensed Products or Territory(ies), we shall re-execute a new version of this undertaking amended accordingly.

[DISTRIBUTOR]

By: _____

Title: _____

Date: _____

## SCHEDULE D

### LETTER OF CREDIT

Name and Address:

ISSUING BANK L/C NO.:

_____

_____

_____      DATED: _____

FORM OF LETTER OF CREDIT TO BE ISSUED BY OR CONFIRMED BY A MAJOR U.S.
MONEY CENTRE BANK.

ADVISING BANK

APPLICANT

BENEFICIARY

SUMMIT PROPERTIES INTERNATIONAL
 as representative for
 Ladies Professional Golf
 Association
600 Third Avenue; 22nd Floor
New York, New York  10016

WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR
FAVOUR, DRAFTS TO BE MARKED "DRAWN UNDER [_____
___] BANK, LETTER OF CREDIT NUMBER [_____]".

PLACE OF EXPIRY:

    TOTAL AMOUNT OF LETTER OF CREDIT _____
    FIRST _____ HAS TO BE DRAWN DOWN BY WITHIN SIXTY DAYS
AFTER PAYMENT IS DUE _____

    NEXT _____ HAS TO BE DRAWN DOWN BY WITHIN SIXTY DAYS
AFTER PAYMENT IS DUE _____

    NEXT _____ HAS TO BE DRAWN DOWN BY WITHIN SIXTY DAYS
AFTER PAYMENT IS DUE _____

CREDIT AVAILABLE WITH: [_____ BANK]
BY: PAYMENT OF YOUR DRAFT(S) AT SIGHT DRAWN ON _____
____ BANK, AND ACCOMPANIED BY THE DOCUMENTS INDICATED HEREIN.

DOCUMENTS REQUIRED:

1.   A SIGNED STATEMENT BY LICENSED PROPERTIES INTERNATIONAL THAT
THE AMOUNT NOW DUE PER THE AGREEMENT DATED _____ HAS NOT
BEEN PAID.

2.   THE ORIGINAL LETTER OF CREDIT.

**THIS LETTER OF CREDIT MAY BE ASSIGNED BY THE BENEFICIARY TO A BANK OF ITS
SELECTION.**

PARTIAL DRAWS ARE ACCEPTABLE.

WE HEREBY ENGAGE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH
THE TERMS OF THIS CREDIT WILL BE DULY HONOURED UPON PRESENTATION AND
DELIVERY OF THE DOCUMENTS AS SPECIFIED IF PRESENTED TO THIS OFFICE
(LETTER OF CREDIT DEPARTMENT, _____) ON OR BEFORE THE
EXPIRY DATE INDICATED ABOVE.

THIS CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR
DOCUMENTARY CREDITS (1993 REVISION), THE INTERNATIONAL CHAMBER OF
COMMERCE, PUBLICATION NO. 400.


_____
Authorized Signature

TERMS AND CONDITIONS

## 1    LICENSING RIGHTS

1.1  During the Term and within the Territory, Licensor grants to Licensee a license subject to the terms and conditions in this Agreement to use the Marks in the design, packaging, promotion and advertisement of the Licensed Products in connection with the manufacture, distribution and retail sale of the Licensed Products.

1.2  For the avoidance of doubt, where the Territory includes one or more Member States of the European Economic Area ("EEA"), nothing in this Agreement shall prevent the Licensee from supplying from time to time unsolicited orders for Licensed Products to purchasers in countries outside the Territory which are Members of the EEA or prevent the Licensor from permitting any other Licensee from supplying any such unsolicited orders for goods in respect of which they are licensed

1.2.1 Notwithstanding the foregoing, the Licensee shall not solicit orders for Licensed Products from purchasers in countries outside the Territory or establish any branch or maintain any distribution depot outside of the Territory.

1.3  Nothing in this Agreement shall be construed as granting Licensee the right to (i) use any other names, logos, emblems, symbols, designs or identifications of Ladies Professional Golf Association than the Marks or (ii) refer to itself as an "Official Licensee" of any of such entity.

1.4  Nothing in this Agreement shall be construed to prevent Licensor from granting any other licenses and rights to other firms, companies, entities, groups or individuals.  All rights not granted in this Agreement are expressly reserved by Licensor.

1.5  If Licensee requests to be provided with a formal statement confirming the rights granted hereunder in order to facilitate the sale of Licensed Products, Licensor undertakes to do so.

## 2    COMPENSATION

2.1  Licensee shall pay to Licensor the Guaranteed Consideration as set forth above which shall be on account of Royalties (as defined in Section 2.2 hereof) to accrue during the Term with respect to all sales under this Agreement in the Territory.  No part of the Guaranteed Consideration shall be waived or repayable to Licensee.

2.2  Licensee shall pay to Licensor a sum equal to the Royalty Rate as set forth above of all Net Invoiced Billings (as defined below) by Licensee for Licensed Products (hereinafter "Royalties"). Royalties shall be payable concurrently and in accordance with the statements required in Section 3 hereof, except to the extent offset by Guaranteed Consideration theretofore remitted.

The term "Net Invoiced Billings" shall mean all monies billable by Licensee or its affiliates from the exercise of its rights to manufacture, distribute and sell Licensed Products under the terms of this Agreement, before any allowances or discounts which have been deducted from the selling price, including interest payments, monetary correction, and any other payment charges whatsoever, less the following items only:

(a)  any sales, excise or value added taxes, which are separately stated, required to be collected from customers as part of Net Invoiced Billings and payable to taxing authorities,

(b)  actual defective returns returned to Licensee and reported to SPI during the Term.

Royalties on sales to any party affiliated with Licensor shall be computed based on Licensee's usual selling price to the trade.

2.3  Upon licensee's execution of the License Agreement, Licensee shall deliver to SPI at the address specified at the front of this agreement, Attention: General Counsel, a letter of credit in the form set forth in Schedule D hereto securing the full amount and each payment of the Guaranteed Consideration.

## 3    STATEMENTS AND PAYMENTS

3.1  All payments shall be paid in U.S. dollars and shall be wired, with the exception of Section 2.2, without set off or deduction of any taxes, costs or other expenses of any kind to such bank and account as is specified by written notice to Licensee (the "Account"). Within thirty (30) days of the end of each calendar quarter during the Term (or more frequently, but not more often than monthly, as and when requested at least one month in advance by SPI or Licensor in writing), commencing on the Effective Date for the first statement, Licensee shall furnish to Licensor, c/o SPI at the address specified at the front of this agreement, Attention: Financial Officer: (i) accurate statements in sufficient detail to show all information requested in writing by or on behalf of Licensor relating to Net Invoiced Billings and Royalties, (ii) copies of all wire transfers made to the Account of Guaranteed Consideration and Royalty payments wired during the preceding month; (iii) if not previously provided in writing to SPI or Licensor: (A) the names and addresses of all third parties manufacturing or distributing Licensed Products or manufacturing component parts thereof for delivery for assembly by Licensee or an affiliate of Licensee, together with specification of the Licensed Product or component part manufactured or distributed by each entity identified, and (B) the terms (other than amounts of payments or royalty percentages) of all agreements permitting the use, in return for consideration, by Licensee or any affiliate of Licensee, of names, trademarks, service marks or other intellectual property of any association of golf players, clubs or organizations.  Such statements shall be furnished whether or not any sales of Licensed Products have occurred during the preceding month or quarter.  Simultaneously with the submission of each such statement, Licensee shall make all related royalty payments by wire transfer to the Account specified above(or in such other manner or to such other account as requested or authorized by SPI or Licensor in writing).  If Licensee shall fail to make any payment when due, Licensee shall pay interest on such overdue amount at a rate equal to the greater of one and one-half percent (1½%) per month or a rate equal to five percent (5%) above the base rate of major US banks as reported by the Wall Street Journal (provided that such interest payment shall be reduced if ant to the extent it exceeds that permitted by law in the applicable jurisdiction) during the period between the date the payment first becomes due and the date such amount is actually paid.  The receipt or acceptance by Licensor or SPI of any statement or royalty payment (including the cashing of any royalty check) shall not preclude Licensor or SPI from subsequently challenging the accuracy of such statement or payment.

3.2  Conversion of national currency to United States Dollars: With respect to each and every remittance required of any and all amounts due SPI pursuant to this Agreement, national currencies/United States Dollar exchange rates shall be based upon the rate quoted by the Wall Street Journal as of the last day of the last reporting period before the due date of said remittance, and Licensee shall furnish SPI with external evidence with respect to the authenticity of the exchange rate used.

1

3.3 Statements and copies of payments shall be submitted to Licensor c/o SPI at the address[es] specified at the front of this agreement, Attention: General Counsel.

## 4  BOOKS AND RECORDS; AUDIT RIGHTS

During the Term and for a two (2) year period thereafter: (a) Licensee shall maintain accurate books of account and records detailing the manufacture, distribution and sale of Licensed Products in accordance with generally accepted accounting principles consistently applied; and (b) Licensor and its designees shall have the right at all reasonable hours of the day, on reasonable prior written notice, to examine and audit such books of account and records and all other documents and materials in Licensee's possession or under its control relating to this Agreement and shall have full access for the purpose of making extracts and copies. Such audits shall be at Licensor's cost, except that if an audit establishes a deficiency of more than two percent (2%) between the amount found to be due to Licensor and the amount actually paid and reported, or if Licensee, at the time Licensor gives Licensee written advance notice of such audit, shall be more than 45 days late in providing any report (or any material portion of a report) or in making any payment or delivering any letter of credit required hereunder, the cost of the audit shall be paid by Licensee, along with the amount of the deficiency, if any, plus interest in accordance with Section 3.

## 5  QUALITY CONTROL; APPROVALS

5.1 All Licensed Products shall be of high standards and of such style, appearance and quality as shall be adequate and suitable to their promotion, distribution and sale to the best advantage to Licensor and at least as high in quality as any other product licensed or produced by Licensee. In order to ensure that Licensee is complying with such standards and the other terms of this Agreement, before the manufacture run of any Licensed Product, Licensee shall submit to SPI for inspection, review and approval on behalf of Licensor, a sample of each Licensed Product, together with its cartons and containers including wrapping material, advertising and other materials utilizing the Marks at each stage of development, including (a) rough artwork, layout, copy and storyboards; (b) finished artwork and proofs; (c) pre-production samples and strike-offs; and (d) finished products and package samples, including all styles and variations thereof. Licensee shall furnish all such items free of charge (including shipping and customs duties and clearance) to SPI, and SPI shall have the right to withhold its approval of any such item in SPI's sole discretion. Licensee shall not manufacture, distribute or sell any Licensed Product without the prior written approval of SPI of such Licensed Product. SPI makes no approval except as to the quality of the Licensed Product as it relates to the use of the Marks as set forth in this Agreement. After samples have been approved by SPI, Licensee shall not make any material changes without SPI's further written approval. Within thirty (30) days after manufacture has commenced, Licensee shall furnish SPI free of charge (including shipping and customs duties and clearance) with six (6) finished samples of each Licensed Product, together with their cartons and containers, including packaging and wrapping material. Licensee shall destroy or remove all Marks from any Licensed Product (or other materials, including promotional materials) not approved by SPI. Such destruction shall be attested to a certificate signed by one of Licensee's officers.

2 In the event that (a) the quality, appearance or style of any censed Product deviates from that approved by Licensor, or (b) the arks or the Licensed Products are, in the reasonable opinion of censor, used by Licensee in any manner contrary to public morals or which is deceptive or misleading or which compromises or reflects unfavourably upon the good name, goodwill, reputation or image of Ladies Professional Golf Association, Licensor, SPI, or any of its affiliates, SPI on behalf of Licensor shall have the right to withdraw its approval with respect to such Licensed Product by providing written notice to Licensee. In such event, Licensee shall cease manufacturing and distributing the offending Licensed product immediately upon notice from SPI, and within ten (10) days after receipt of such notice, shall pay all royalties and amounts due to SPI with respect to such Licensed Product, and all remaining such products shall, at Licensee's cost, be returned to SPI or destroyed or stripped of all Marks (in which case a certificate attesting to same shall be provided to Licensor) within ten (10) days after receipt of notice. If there are Licensed Products not affected by this subparagraph, this Agreement shall remain in full force and effect as to those Licensed Products.

5.3 Before producing, distributing or or publishing promotional and advertising materials incorporating the Marks, Licensee shall submit such materials to SPI for its written approval on behalf of Licensor which may be withheld in SPI's sole discretion (but not on the basis of the amount of the price). In no event shall Licensee use such promotional or advertising materials before receiving SPI's written approval. After an item has been so approved by SPI, Licensee shall not make any material changes without seeking SPI's further written approval. Licensee represents and warrants that all advertising and promotional materials shall comply with all applicable laws, regulations and industry standards. SPI's approval of such materials shall not constitute or imply a representation or belief by SPI or Licensor that such materials are sufficient to meet applicable laws, regulations and industry standards.

5.4 All items required to be submitted for approval hereunder shall be submitted to SPI at the address specified at the front of this agreement, or to any other address which SPI advises Licensee in writing, Attention: General Counsel

5.5 Licensee shall not itself, nor shall it authorize any third party to, offer for sale, sell, ship, advertise, promote, distribute or use for any purpose any Licensed Products which are damaged, defective, irregular, seconds, or otherwise fail to meet the specifications or quality standards or trademarks or copyright usage or notice requirements of this Agreement or the Graphic Standards Manual.

## 6  LICENSOR'S OWNERSHIP OF ALL RIGHTS IN THE MARKS

Licensor warrants that, and Licensee acknowledges that as between Licensee and Licensor, the Marks and all copyrights, trademark registrations, trademark rights and other proprietary rights in and to the Marks are exclusively owned and controlled by Licensor. Licensee acknowledges that Licensor shall have the right to terminate this Agreement in the event the Licensee asserts any rights in or to the Marks. Licensee further agrees and acknowledges that all rights in and to any and all artwork created (including all artwork created in whole or in part by Licensee to the extent the marks are used or incorporated therein) or authorized for use hereunder by Licensor in connection with the Licensed Product(s) or otherwise which uses or incorporates Marks shall be, as between Licensee and Licensor, owned, reserved, or controlled in its entirety exclusively by Licensor, who shall be the author at law and copyright proprietor thereof.

## 7  USE OF MARKS; PROTECTION OF RIGHTS

7.1 In every instance in which the Marks are used, Licensee shall comply fully with the terms of this Agreement and the provisions set

forth in the Graphic Standards Manual and shall cause to appear adjacent to such use by means of an imprint or other appropriate device, the "©","®" or "™" notice or such other copyright, trademark or service mark notices and reasonable authentication devices as Licensor may from time to time require in writing. Licensee shall not use the Marks in any other manner other than pursuant to this License Agreement.

7.2

7.2.1 Licensee shall ensure that the Marks are used solely on or in connection with the Licensed Products, and Licensee shall restrict the use of the Marks in its advertisements, including radio, television, point of sale materials, printed matter and the like to identification, use and promotion of the Licensed Products, excluding any other product or service manufactured, performed, distributed, sold or advertised by Licensee or any third party.

7.2.2 Licensee shall not distribute or sell the Licensed Products as "Premiums" and shall not permit the sale or distribution of Licensed Products as "Premiums" except as permitted herein or otherwise permitted in writing by or on behalf of Licensor in writing. For purposes of this Agreement, a "Premium" means any product or merchandise bearing the Marks and given away free, or sold at substantially less than its regular selling price, for the purpose of promoting the sale of the products, merchandise or services of a third party or for other give-away or promotional purposes.

7.2.3    Notwithstanding the foregoing, Licensee shall be entitled to sell Licensed Products for use as Premiums to any Commercial Affiliate (as defined below), provided that prior to making any such sale, Licensee shall obtain Licensor's written consent; and provided further that all such sales shall be deemed sales of Licensed Products hereunder.   As used herein, "Commercial Affiliate" shall mean any Official Sponsor, Official Supplier or Official Product/Service Company of Ladies Professional Golf Association or any Tournament.

7.2.4 Licensee shall not use as a corporate or other legal name, trademark, trade name or service mark, the words or marks "LPGA", or any similar indicia or derivation thereof in any language, for the purpose of identifying with, or with the effect of causing confusion among consumers concerning the association of products, services or parties with, the Ladies Professional Golf Association or any tournament or in any way attempt to compete with Licensor's Marks.

.3    Licensee shall be permitted to use the designation "Official .icensed Product [or Licensee] of the [Ladies Professional Golf .ssociation/LPGA]" in connection with the advertising, promotion, istribution and sale of Licensed Products, but shall not be permitted 1 use any other designation of Licensee or a Licensed Product ontaining the word "official" (or any similar term in any language) id either "LPGA" or "Ladies Professional Golf Association." For e avoidance of doubt it is understood that the term "Licensed oduct" and "Licensee" as used in the aforementioned designation all under no circumstances be replaced with the name or description any product or service including Licensed Products manufactured, 'd or distributed by Licensee.

Licensee shall not use the Marks in any manner contrary to public rals or which is deceptive or misleading or which compromises or lects unfavourably upon the good name, goodwill, reputation or

image of Ladies Professional Golf Association, LPGA tournaments, or SPI.

7.5 Licensee shall cause its name, trade name (or a trademark of Licensee's which it has advised Licensor in writing that it is using and received Licensor's written approval) and the country of manufacture of the Licensed Product to appear on the permanently affixed labelling on each Licensed Product and, if the Licensed Product is sold to the public in packaging or a container, printed on such packaging or container so that the public can identify the supplier of the Licensed Product. On soft goods, "permanently affixed" shall mean sewn on. Licensee shall advise SPI in writing of all trade names or trademarks it desires to use on or in connection with Licensed Products being sold under this Agreement if such names or marks differ from its corporate name as indicated herein and shall obtain SPI's prior written approval on Licensor's behalf prior to using such names or marks.

7.6 Licensee shall not associate other trademarks, device marks, logos or any other properties with the Marks, either on Licensed Products or on their packaging, advertising, promotional or display materials without the prior written approval of Licensor or SPI. Licensee shall secure all rights required for the use of and all photos, images, likenesses, names and proprietary matter used in or on the Licensed Products other than the Marks.

7.7 Licensee shall not use the Marks or any reproduction thereof in any advertising, promotional or display material or on letterhead, business cards or in any other manner without SPI's prior review and approval.

7.8 Licensee shall not at any time apply for any copyright, trademark or patent protection which would affect the ownership of any rights in the Marks nor file any document with any governmental authority or take any other action which could affect the ownership of the Marks, or aid or abet anyone else in doing so. Any copyright, trademark or service mark affecting the Marks already procured or applied for by Licensee shall be assigned to Licensor upon request, and Licensee shall execute and deliver such documents as may be required to evidence such assignment.

7.9 Licensee shall assist in the protection of the rights of Licensor in and to the Marks by giving Licensor prompt written notice of any unlicensed use by third parties of the Marks or material of which Licensee is aware and which infringes any rights in the Marks due to its similarity thereto. Licensor shall have the sole right, but not the obligation, to take any action with respect to any unlicensed use of the Marks or any infringement or imitation of the Marks. Licensee shall not bring or cause to be brought any criminal prosecution, civil lawsuit or administrative action for infringement, interference with or violation of any rights to the Marks or violation of any rights granted herein. Licensee shall cooperate in any action against an infringer of Licensor's rights hereunder that Licensor may in its sole discretion bring, provided it gives Licensee prior written notice of such action and bears the expense thereof. Any and all settlements, penalties, damages, and recoveries arising from or in connection with such action shall be the sole property of Licensor.

7.10    Licensee shall not adopt or use any trademark, symbol, mark or designation which includes or is confusingly similar to, or is a simulation or colourable imitation of, the Marks or unfairly competes with the Marks.

7.11    Licensee acknowledges that proof of use of the Marks on Licensed Products is an important aspect of Licensor's ability to obtain registration and enforce the Marks on behalf of Ladies Professional Golf Association in various countries. To assist Licensor in this regard,

3

Licensee hereby undertakes to commercially use the Marks on Licensed Products in each part of the Territory on or before the Marketing Date and, upon request, to provide to Licensor up to six (6) samples of such Licensed Products bearing the Marks and proof of such use in each part of the Territory (ies), by delivering such samples to Licensor c/o SPI at the address specified in the front of this agreement or to such other address as Licensor or SPI shall specify in writing. To the extent that Licensee has not used the Marks on a Licensed Product in a country of the Territory, Licensee acknowledges that Licensor may be unable to obtain trademark protection of the Marks for such Licensed Product in such country(ies).

## 8    GOODWILL

Licensee recognizes the value of the Marks and acknowledges that the goodwill attached to the Marks belongs to Licensor and that the Marks have secondary meaning in the minds of the public. All use of the Marks hereunder shall inure to the benefit of Licensor. Licensee shall not, during the Term or thereafter, attack the property rights of Licensor in and to the Marks.

## 9    USE OF PLAYERS

This Agreement does not grant to Licensee any rights or license with respect to the use of the likeness, names and/or other information of any player of any Golf Association and Licensee shall not use any pictures, names and/or information in connection with any Licensed Product unless Licensee shall have first obtained the express written consent of the subject player or entity authorized to act on his behalf.

## 10  MANUFACTURE OF LICENSED PRODUCTS BY NON-AFFILIATE MANUFACTURERS

10.1  If Licensee at any time desires to have Licensed Products or components thereof containing the Marks manufactured by an unaffiliated third party, Licensee shall notify Licensor of the name and address of such manufacturer and the Licensed Products or components involved and obtain Licensor's prior written permission to do so. The granting of said permission may, in Licensor's sole discretion, be conditional upon Licensee's causing each such manufacturer to sign a Letter of Undertaking as provided for in Schedule B hereto and delivering a copy of such executed Letter of Undertaking to Licensor. Any addition or amendment of the Licensed Products or components thereof to be manufactured shall require the submission of an additional Letter of Undertaking reflecting such changes and the prior written approval of SPI of Licensor.

10.2  If any such manufacturer utilizes the Marks for any unauthorized purpose, Licensee shall take all necessary steps or measures to bring such utilization to an immediate halt, including termination of such manufacturer's right to manufacture products bearing the Marks, provided such steps or measures do not violate any applicable law including, if applicable, Competition rules of the EEA prohibiting restrictions on the free movement of goods and services within the EEA. Without limiting the foregoing, Licensee shall take all necessary steps or measures to ensure any approved manufacturer's compliance with the applicable terms of this Agreement, including the submissions required under Section 5 hereof.

## 1    DISTRIBUTION; COMPLIANCES

1.1    Commencing on or before the Marketing Date, and continuing throughout the Term:

11.1.1 Licensee shall manufacture, distribute and sell, within and throughout the Territory, each Licensed Product in such manner as may be required to meet competition by reputable manufacturers of similar products.

11.1.2 Licensee shall make and maintain adequate arrangements for the manufacture, distribution, sale and timely delivery of sufficient quantities of each Licensed Product to distributors and retailers within and throughout the Territory to meet the demands of the marketplace, and its obligations to distributors and retailers.

11.1.3  Licensee agrees to restrict, and to ensure that its distributors restrict, distribution of Licensed Products to better retail outlets which market and sell products bearing competitive marks and which maintain superior quality of products, presentation, appearance, ambiance, staffing and customer support, and product inventory (in proportion to size), quality and availability, giving due consideration to regional differences in taste, custom, decorum, sensitivities and protocol in the Territory

11.2    Licensee shall not sell or distribute the Licensed Products to any person or firm that is located in a non-EEA country outside of its specified Territory and shall prohibit its customers from doing so.

11.3    In the event Licensee sells or distributes other licensed merchandise of a similar quality as the Licensed Products, Licensee shall not discriminate in the granting of commissions and discounts to salespeople, dealers and distributors between Licensed Products and products licensed by other parties.

11.4    Licensee shall at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry.

11.5    Licensee shall, at its sole expense, obtain all approvals of any foreign authorities which may be necessary in connection with Licensee's performance under this Agreement.

11.6    If Licensee at any time desires to have Licensed Products distributed by a third party, Licensee shall notify Licensor of the name and address of such distributor and the Licensed Product(s) and Territory(ies) of distribution and obtain Licensor's prior written permission. The granting of said permission will be conditional upon Licensee causing each such distributor to sign a Letter of Undertaking as provided for in Schedule C hereto and delivering a copy of such Letter of Undertaking to Licensor. Any addition or amendment with respect to the Licensed Products to be distributed or the Territory(ies) shall require the submission of an additional Letter of Undertaking reflecting such changes and SPI's prior written approval on Licensor's behalf.

11.7  If any such distributor utilizes the Marks for any unauthorized purpose, or distributes the Licensed Products outside of the Territory, Licensee shall take all necessary steps or measures to bring such utilization or distribution to an immediate halt provided such steps or measures do not violate the Competition rules of the EEA prohibiting restrictions on the free movement of goods and services within the EEA, including the cancellation of such distributor's right to distribute and sell products bearing the Marks. Without limiting the foregoing, Licensee shall take all necessary steps and measures to ensure any approved distributor's compliance with the applicable terms of this Agreement.

4

## 12  WARRANTIES

12.1  Each party represents and warrants that it has the right and authority to enter into this Agreement and to grant the rights and render the performances under this Agreement.

12.2  Licensee represents and warrants that:

(a)  it shall not, by virtue of this Agreement, obtain or claim any right, title or interest in or to the Marks except the rights of use as specifically set forth herein;

(b)  it shall comply with all terms of this Agreement including obtaining all required approvals;

(c)  this Agreement does not and shall not violate the terms of any agreement between Licensee and any third party.

## 13  INDEMNIFICATION

Licensee hereby agrees to be solely responsible for, defend, hold harmless and indemnify each of Licensor, Ladies Professional Golf Association, SPI and their respective parents, partners, subsidiaries, affiliates, directors, officers, employees, agents and related entities (the "Licensor Indemnified Parties") from and against any claims, demands, causes of action or damages, including, without limitation, fees and disbursements of counsel incurred by the Licensor Indemnified Parties in any action or proceeding between the Licensee and the Licensor Indemnified Parties or between the Licensor Indemnified Parties and any third party or otherwise, (collectively, "Claims"), arising out of (i) any act or omission of Licensee, its manufacturers or distributors, or (ii) any breach of Licensee's representations, warranties or obligations under this Agreement by Licensee. This indemnity shall extend, without limitation, to any (iii) claims by or against third parties arising from the manufacture, shipment, solicitation, sale, use or distribution of the Licensed Product(s), and (iv) claims arising among the Licensor Indemnified Parties, Licensee and Licensee's customers, distributors or manufacturers of the Licensed Products. In any instance to which the foregoing indemnities pertain, Licensee shall keep the Licensor Indemnified Parties fully advised of all developments and shall not enter into a settlement of such action or claim without Licensor's prior written approval, which shall not be unreasonably withheld. The Licensor Indemnified Parties shall have the right to defend any such action or proceeding with attorneys of their own selection.

## 4  BREACH; DEFAULT

4.1  In the event Licensee fails to commence distribution on or before the Marketing Date, distributes unapproved product or advertising bearing the Marks, or distributes any Licensed Products outside of the Territory(ies) subject to Section 1.2 hereof, Licensor shall have the right to immediately revoke Licensee's rights with respect to any Licensed Products, Territory, or part thereof and/or to charge Licensee, as liquidated damages, one-half of the aggregate amount of the Guaranteed Consideration hereunder for each such breach. Such rights shall be without prejudice to any other rights that Licensor may have under this Agreement or otherwise.

.2  Notwithstanding, and without limiting, any other provision of this Agreement, Licensor shall have the right to terminate this Agreement in its entirety, or to reduce or eliminate any of Licensee's rights hereunder, by written notice if:

14.2.1  Licensee shall fail to make any payment due under this Agreement or to deliver any of the statements or letters of credit

required to be delivered, and if such default shall continue for a period of ten (10) days after receipt of written notice of such default; or

14.2.2  (i) Licensee at any time during the Term hereof, shall have failed to make any payment due under this Agreement or to deliver any of the statements or letters of credit required to be delivered, and, (ii) such default shall have continued for a period of ten (10) days after receipt of written notice of such default and, (iii) whether or not such default is thereafter cured, licensee thereafter fails to make any payment due under this Agreement or to deliver any of the statements or letters of credit required to be delivered; or

14.2.3  Licensee shall be unable to pay its liabilities when due, or shall make any assignment for the benefit of creditors, or shall file or shall have filed against it any bankruptcy petition, or be adjudicated bankrupt or insolvent, or if any receiver is appointed for its business or property; or

14.2.4  Licensee shall make any assignment, sublicense, subcontract or encumbrance upon this agreement or the rights granted herein without Licensor's prior written consent; or

14.2.5  Licensee shall fail to perform or shall be in breach of any other term or condition of this Agreement and such breach continues for a period of thirty (30) days after written notice of such breach is sent by Licensor; or

14.2.6  Licensee at any time during the Term hereof: (i) shall have failed to perform or shall been in breach of any other term or condition of this Agreement and (ii) such breach shall have continued for a period of thirty (30) days after written notice of such breach was sent by Licensor, and (iii) shall similarly fail to perform or shall been in similar breach of any other term or condition of this Agreement; or

14.2.7  Licensee makes or issues any public communication which disparages or defames Licensor.

14.3  Upon termination or revocation of Licensee's rights, Licensee shall provide a statement of remaining inventory and said inventory shall, at Licensor's option, (a) be destroyed, in which case Licensee shall provide Licensor with a certificate of such destruction, in form and substance reasonably satisfactory to Licensor, or (b) be shipped, at Licensee's sole expense (except in the event of a termination due to a cause beyond Licensee's control, in which case Licensor shall reimburse Licensee for its documented reasonable out-of-pocket costs of manufacture and shipment thereof) to SPI, within twenty (20) days of such termination or revocation. All Guaranteed Consideration and Royalties not yet remitted which are previously due or yet to become due hereunder shall immediately become due as of the date of such termination or revocation and Licensee shall provide outstanding royalty statements and remit outstanding Guaranty payments to Licensor within ten (10) days. All rights granted to Licensee shall revert automatically to Licensor as of the date of such termination or revocation.

## 15  EQUITABLE REMEDIES

Licensee acknowledges that the Marks possess a special, unique and extraordinary character which makes difficult the assessment of the monetary damage which would be sustained by the unauthorized use of the Marks. Licensee recognizes that irreparable injury would be caused by the unauthorized use of the Marks and agrees that Licensor shall not be required to prove damages

or to post a bond as a prerequisite to obtaining injunctive and other equitable relief in the event of a breach of this Agreement by Licensee.

## 16  DISPOSAL OF STOCK

After the expiration or termination of this Agreement, Licensee shall have no further right to manufacture, advertise, distribute, sell or otherwise utilize the Marks except as provided herein. After the expiration (but not the termination) of this Agreement, Licensee may dispose of Licensed Products which are on hand or in process on the date of such expiration, but only in the normal course of business, for a period of ninety (90) days (the "Sell-Off Period"), provided that all payments then due are first made to Licensor and that statements and payments with respect to the Sell-Off Period are made in accordance with this Agreement. Licensee shall furnish Licensor with a statement of all inventory on hand and in process sixty (60) days prior to, and at the start of, the Sell-Off Period. At any time during the Sell-Off Period, Licensor shall have the right to conduct a physical inventory to verify such statements. In the event Licensee refuses to permit such physical inventory, Licensee shall forfeit its right to dispose of Licensed Products under this paragraph. After the Sell-Off Period, and upon termination of this Agreement, all inventory on hand or in process (including all promotional and packaging materials) shall be destroyed or, upon request by SPI, shipped to SPI, subject to reimbursement of the reasonable costs of such shipment to the extent approved in writing by SPI before such shipment. Such destruction shall be attested to in a certificate signed by one of Licensee's officers. All contractual restrictions set forth herein shall continue through the sell-off period.

## 17  NOTICES

All notices hereunder shall be given in writing at the respective addresses of the parties as set forth at the front of this agreement, unless notification of a change of address is given in writing. Notices hereunder shall be effective upon dispatch if given by email or fax and confirmed by mail or recognized international courier. Any notice shall be effective when received by registered or certified mail or by recognized international courier providing written evidence of delivery.

## 18  NO JOINT VENTURE

Nothing in this Agreement shall be construed to place the parties in the relationship of partners or joint venturers and Licensee shall have no power to obligate or bind Licensor to any third party in any manner whatsoever.

## 9  MISCELLANEOUS

9.1  No failure on the part of Licensor to exercise any right under this Agreement shall operate as a waiver of such right, nor shall any single or partial exercise of any right under this Agreement preclude any other further exercise of such right or any other right.

1.2  Licensee hereby (i) agrees that any litigation, action or proceeding arising out of or relating to this Agreement may be instituted in any state or federal court in the City of New York, (ii) waives any objection which it may have now or hereafter to the venue of any such litigation, action or proceeding, and (iii) waives any claim defence of inconvenient forum. Licensee hereby consents to service of process by registered or certified mail, return receipt requested or internationally recognized courier service, provided proof of service obtained, at Licensee's address and expressly waives the benefit of

any contrary provision of foreign law. Nothing in this paragraph shall affect Licensor's right to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Licensee in any other court in which Licensee is subject to suit. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts entered into and fully performed therein.

19.3  This Agreement and any rights granted under this Agreement are personal to Licensee and shall not be assigned, sublicensed or encumbered, directly or indirectly, by law or by contract, without the prior written consent of Licensor. Any nonconsensual assignment, sublicense, subcontract or encumbrance of this Agreement shall be invalid and of no force or effect.

19.4  None of the provisions of this Agreement can be waived or modified except expressly in a writing signed by all parties.

19.5  Notwithstanding anything to the contrary contained herein, Licensee's obligations and Licensor's rights under Sections 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, and 19 hereof shall survive the expiration or termination of this Agreement and shall remain in full force and effect until fully discharged. All representations and warranties made in this Agreement by either party shall survive any independent investigation made by the other party on its behalf.

19.6  During the Term of this Agreement and thereafter, Licensee shall not disclose to any third party (other than its respective employees, in their capacity as such, and to SPI) any of the financial terms and provisions of this Agreement except: (a) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event Licensee shall so notify Licensor prior to making such disclosure and shall seek confidential treatment of such information, (b) as part of its normal reporting or review procedure to its parent company, its partners, its auditors and its attorneys, provided, however, that such parent company, partners, auditors and attorneys agree to be bound by the provisions of this Section, without the prior written consent of Licensor.

19.7  This Agreement, when fully-executed, shall constitute the entire agreement and understanding among the parties and cancels, terminates and supersedes any prior agreement or understanding relating to the subject matter of this agreement among the parties.

19.8  As used herein, the word, "including" shall mean "including without limitation."

[LICENSEE
NAME &
ADDRESS]

ROYALTY
STATEMENT

Summit Properties International
600 Third Avenue; 22nd floor
New York, NY 10016
USA
Attention: Financial Officer
Phone: 212-490-1100
Fax:  212-682-5191
email: spiusa@i-2000.com

CONTRACT NO:  PGAT-_____          LICENSEE: _____

PERIOD: _____          LICENSOR: Ladies Professional Golf
Association

NOTE:  PAYMENT MUST BE MADE IN U.S. $ by wire transfer to THE BERKSHIRE
BANK NEW YORK, NY 10022; ABA 026011921; A/C SUMMIT PROPERTIES
INTERNATIONAL;  A/C No. 3007359 or to such other bank and account as
specified by written notice to Licensee

(1)    PREPAID ROYALTY BALANCE - BEGINNING OF PERIOD          _____

(2)    TOTAL NET SALES (Net Invoiced Billings)
     (total of amounts itemized on attachments)          _____

(3)    ROYALTY - __% OF TOTAL NET SALES

(4)    ADVANCE ROYALTY APPLIED TO THIS PERIOD
    LINE (1) OR LINE (3) WHICHEVER IS SMALLER          _____

(5)    PREPAID ROYALTY BALANCE - END OF PERIOD
    LINE (1) LESS LINE (4)          _____

(6)    AMOUNT OF ROYALTY - LINE (3) LESS LINE (4)          _____
IF LINE 6 IS IN CURRENCY OTHER THAN U.S.$, COMPLETE LINE 8 BELOW

(7)    AMOUNT OF ROYALTY, IN U.S.$          _____

(8)    CONVERSION RATE          _____

SUBMITTED BY: _____

IF THERE HAVE BEEN NO SALES DURING THE ABOVE MENTIONED ROYALTY PERIOD, PLEASE
INDICATE SO ON THIS FORM.  PLEASE SEND THIS COMPLETED ROYALTY REPORT WITH A
COPY OF THE WIRE TRANSFER ORDER TO:

Summit Properties International
600 Third Avenue; 22nd floor
New York, NY 10016
USA
Attention: Financial Officer
Phone: 212-490-1100
Fax:  212-682-5191

[SEPARATE SHEET TO BE SUBMITTED FOR EACH LICENSED PRODUCT]

LICENSEE:

CONTRACT NUMBER: PGAT- _____

PRODUCT: _____

TERRITORY: _____

|  | NET UNITS | WHLSE PRICE | NET SALES |
|---|---|---|---|
| Ladies Professional Golf Association | | | _____ |

PRODUCT/TERRITORY TOTAL NET SALES _____

EXHIBITS 11(d)(i), 11(d)(ii) and 11(d)(iii)

**Existing Trademark Registrations**
**Pending Trademark Applications**
**Trademark Applications to be Filed**

# TRADEMARK REGISTRY

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| **United States** |  (referred to hereinafter as "LPGA Logo") | 1,790,756 | 41 | Sponsoring, promoting and conducting golf tournaments and other golf related events | REGISTERED |
| | | 2,499,376 | 25 | Golf clothing and sportswear, headwear and footwear | REGISTERED |
| | | | 28 | Golf sporting goods and related golf equipment | REGISTERED |
| | | | 14 | Jewelry | REGISTERED |
| | | | 18 | Golf duffel bags and tote bags | REGISTERED |
| | | | 24 | Golf towels | REGISTERED |
| | LPGA (referred to hereinafter as | 2,420,580 | 25 | Golf sportswear, namely jackets, shirts, sweatshirts, socks and pullovers, headwear and footwear | REGISTERED |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| |  "LPGA Word Mark") (referred to hereinafter as "LPGA International Logo") | 2,401,415 | 41 | Sporting, training and educational services, namely, golf tournaments, golf lessons and golf facilities and golf courses, featuring facilities for refreshments | REGISTERED |
| | | | 25 | Golf sportswear, namely, shirts, shorts, sweaters, vests, jackets and sweatshirts and headwear | REGISTERED |
| | | | 28 | Golf sporting goods and related golf equipment, namely golf balls, golf bags, golf club headcovers and golf gloves | REGISTERED |
| | | | 14 | Jewelry | REGISTERED |
| | | | 21 | Beverage glassware | REGISTERED |
| | LPGA INTERNATIONAL (referred to hereinafter as "LPGA International Word Mark") | 2,420,581 | 25 | Golf sportswear, namely, shirts, shorts, sweaters, vests, jackets and sweatshirts, and headwear | REGISTERED |
| | | | 28 | Golf sporting goods and related golf equipment, namely golf balls, golf bags, golf club headcovers and golf gloves | REGISTERED |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| | **LPGA TOUR** (referred to hereinafter as "LPGA Tour Word Mark") | 2,397,059 | 25 | Sponsoring, promotion and conducting golf tournaments and related golfing events | REGISTERED |
| | | | 28 | Golf apparel and sportswear, namely jackets and shirts, headwear and footwear | REGISTERED |
| *Argentina* | LPGA Logo | 2,373,041 | 25 | All goods in International Class 25 | PENDING |
| | | 2,373,042 | 28 | All goods in International Class 28 | PENDING |
| *Australia* | LPGA Logo | 808471 | 25 | Clothing, footwear and headwear | PENDING |
| | | 810088 | 28 | Games, playthings and sporting articles (not in other classes) | REGISTERED |
| | LPGA Word Mark | 808472 | 25 | Clothing, footwear and headwear | PENDING |
| *Brazil* | LPGA Logo | 824248775 | 25 | Clothing, footwear and headwear | PENDING |
| | | 824248783 | 28 | Games, playthings and sporting articles (not in other classes) | PENDING |
| *Canada* | LPGA Logo | 554,490 | 41 | Sponsoring, promoting and conducting golf tournaments and other golf related events | REGISTERED |
| | | | 25 | Clothing, headwear and footwear | REGISTERED |
| | | | 28 | Sporting good and related golf equipment | REGISTERED |
| | | | 14 | Jewelry | REGISTERED |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| | | | 18 | Duffel and tote bags | REGISTERED |
| | | | 24 | Towels | REGISTERED |
| Chile | LPGA Logo | 547353 | 25 | Clothing, footwear and headgear | REGISTERED |
| | LPGA Logo | 547352 | 28 | Games, playthings and sporting articles | REGISTERED |
| China | LPGA Logo | 1250656 | 25 | Clothing, footwear and headgear | REGISTERED |
| | LPGA Logo | ? | 28 | Games, playthings and sporting articles | SUSPENDED |
| Costa Rica | LPGA Logo | 10,900 | 25 | Clothing, footwear and headgear | REGISTERED |
| | | 10,972 | 28 | Games, playthings and sporting articles | REGISTERED |
| European Union | LPGA Logo | 2354173 | 25 | Clothing, footwear and headgear | PENDING |
| | | | 28 | Games and playthings; gymnastic and sporting articles not included in other classes | PENDING |
| | | | 41 | Education; providing of training; entertainment; sporting and cultural activities | PENDING |
| Hong Kong | LPGA Logo | B1753/99 | 25 | Clothing, footwear and headgear | REGISTERED |
| India | LPGA Logo | 1046530 | 25 | Clothing, footwear and headgear | PENDING |
| | | | 28 | Games, playthings and sporting | PENDING |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| | | | | articles (not in other classes) | |
| **Indonesia** | LPGA Logo | D002001 21490-21646<br>D002001 21494-21650<br>D002001 21496-21652 | 25 | Clothing, footwear and headgear | PENDING |
| | LPGA Logo | D002001 21491-21647<br>D002001 21493-21649<br>D002001 21495-21651 | 28 | Games, playthings and sporting articles (not in other classes) | PENDING |
| **Ireland** | LPGA Logo | B155890 | 28 | Golf clubs, golf bags and golf balls | REGISTERED |
| **Japan** | LPGA Word Mark | 1595307 | 16 | Papers, stationery | REGISTERED |
| **Korea (South)** | LPGA Logo | 446387 | 25 | Caps, t-shirts, dress shirts, shorts, sweatpants, socks, jeans, jackets, sweaters, sweat shirts, sport shirts (including golf shirts), skirts and windcheaters | REGISTERED |
| | | 2001-29466 | 28 | Golf equipment, golf accessories, golf tees, golf balls, golf ball markers, golf bags, golf clubs, golf club head covers, sporting articles, game simulators, articles for use in game of golf, golf gloves | PENDING |
| | LPGA Logo | 441790 | 18 | Cases, wallets, handbags, holdalls, rucksacks, belt bags, portfolios, cardholders, pouches, sport bags, travel bags, spectacle cases, key fobs, credit card cases | REGISTERED |
| **Malaysia** | LPGA Logo | 2001-11698 | 25 | Clothing, footwear and headwear | PENDING |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---|---|---|---|---|---|
| | | 2001-11697 | 28 | Games, playthings and sporting articles; gymnastic and sporting articles, golf clubs, golf balls, golf tees; apparatus for use in the game of golf; parts and fittings for all the aforesaid goods | PENDING |
| Mexico | LPGA Logo | 539366 | 25 | Clothing, footwear and headwear | PENDING |
| | | 539367 | 28 | Games, playthings and sporting articles | PENDING |
| New Zealand | LPGA Logo | 645,053 | 25 | Clothing, footwear and headgear | PENDING |
| | | B223,834 | 28 | Golf clubs, golf bags and golf balls | REGISTERED |
| Singapore | LPGA Logo | T01/18771I | 25 | Clothing, footwear and headwear | PENDING |
| | | T01/18772I | 28 | Games, playthings and sporting | PENDING |
| South Africa | LPGA Logo | 2001/21466 | 25 | Clothing, footwear, headgear, parts, accessories and accoutrements for the foregoing | PENDING |
| | | 2001/21467 | 28 | Games, playthings; gymnastic and sporting articles not included in other classes; parts, accessories and peripherals of the foregoing all in Class 28 | PENDING |
| Switzerland | LPGA Logo | 494,205 | 25 | Clothing, footwear and headwear | REGISTERED |
| | | | 28 | Games, playthings and sporting articles | REGISTERED |

| Country | Trademark | Registration/Application No. | Classes | Goods and Services | Status, References |
|---------|-----------|------------------------------|---------|--------------------|--------------------|
| *Taiwan* | LPGA Logo | 90028072 | 25 | Clothing, footwear and headwear | PENDING |
| | LPGA Logo | ? | 28 | Games, playthings and sporting articles | SUSPENDED |
| *Thailand* | LPGA Logo | 474303 | 25 | Clothing, footwear and headgear | PENDING |
| | | 474304 | 28 | Games, playthings and sporting articles | PENDING |
| *United Kingdom* | LPGA Logo | B1521839 | 28 | Golf clubs, golf bags and golf balls | REGISTERED |
| *Venezuela* | LPGA Logo | 22451-2001 | 25 | Clothing, footwear and headgear | PENDING |
| *Vietnam* | LPGA Logo | 4-2001-03994 | 25 | Clothing, footwear and headgear | PENDING |
| | | | 28 | Games, playthings and sporting articles | PENDING |

EXHIBIT 11(k)(i)

| Licensee | Category | Rights | Territory | Term |
|---|---|---|---|---|
| **Anheuser-Busch: Michelob Light** | Anheuser-Busch can use the logo in the packaging, sales and promotional efforts of Michelob Light Brand in the United States and in the following classes and countries: United Kingdom, 28; Ireland, 28; New Zealand, 28; Hong Kong, 25; China, 25; Korea, 25; and Canada, 10, 14, 25, 28 and 41. (Use in this manner does not include the merchandising of the logo with respect to malt beverages. | Non-exclusive | (see "category") | Terminates December 31, 2002 |
| *Golf Design* | Golf divot tools, ball markers, golf accessories (excluding lapel/hat pins) | Non-exclusive | United States | 2000-2002 |
| *Profile Pursuit* | 50th Anniversary Yearbook, Semi-hardback yearbooks, lifestyle supplements | Exclusive | Worldwide | 1999-2002 2002-2005 (with conditional option to extend until 2007) |
| *Square Two Golf* | Golf clubs, golf bags, golf balls, golf gloves, golf shoes, carryalls, hats, visors, umbrellas | Non-exclusive (except with respect to golf clubs) | Worldwide | 1998-2003 (with option to extend until 2005) |
| **Sunderland of Scotland** | Rainwear | Exclusive | Worldwide | 2002 |
| *Time Out* | Knit shirts, long and short sleeve t-shirts, denim and twill long sleeve | Non-exclusive | United States | 2000-2003 |

| | | | | | |
|---|---|---|---|---|---|
| *Izod Club* | Golf Apparel for the T&CP Division | shirts, jackets, wind vests, wind shirts, shorts, short sleeve and sleeveless pique golf shirts, vests, cardigans | Non-exclusive | United States | 2002 |

EXHIBIT 11(k)(ii)

deleted

EXHIBIT 11(k)(iii)

## Tournament Sponsor Materials

The following is a list of the materials on which tournament sponsors must use the Property in the Territory.

- Tournament stationery
- Print advertising
- Billboard advertising
- Programs
- Pairing sheets
- Spectator guides
- Course maps
- Posters (for promotional use only)
- Ticket/sponsorship brochures
- Tickets/badges
- Banners (including television towers and tournament functions)
- Media center signs (including interview area)
- Scoreboards
- Directions/parking/entry-exit signs