UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SUMMIT PROPERTIES INTERNATIONAL, LLC,


                                    Plaintiff,                    **MEMORANDUM &**
                                                                  **ORDER**

                                                                  07 Civ. 10407 (LBS)
                        v.

LADIES PROFESSIONAL GOLF ASSOCIATION,


                                    Defendant.

_____

SAND, J.

        Plaintiff Summit Properties International, LLC ("Summit") was the exclusive

licensing agent for Defendant Ladies Professional Golf Association ("LPGA") from 1999

until 2006.  In 2006, LPGA terminated the relationship with Summit.  Summit filed this

diversity action for breach of contract.  Both parties have moved for partial summary

judgment.  In addition, LPGA has filed four motions *in limine*.  LPGA's partial summary

judgment motion is granted in part, denied in part.  As a result, LPGA's motions *in limine*

are moot.  Summit's partial summary judgment motion is granted in its entirety.

**I.      Background**

        In 1999, Summit and LPGA entered into a Representation Agreement, which

appointed Summit as the exclusive licensing representative of LPGA outside of the

United States.  In 2002, the parties executed the Amended and Restated Representation

Agreement, which expanded Summit's role to include the United States.  (Holmes Aff.

Ex. A ("Agreement").)  The Agreement operated until March 31, 2007, unless extended or terminated in accordance with the provisions of the Agreement.  According to the Agreement, Summit had the right to extend the Agreement "as it is in effect as of June 30, 2006 through December 31, 2009 by notice given on or before September 30, 2006." (Agreement ¶ 18(a).)  Summit was required to pay LPGA annual payments ("Guarantees") regardless of the amount of the royalties Summit collected.  (Def.'s 56.1 ¶ 2.)  These payments ensured that LPGA would receive a minimum amount of revenue.

From 2002 to 2005, Summit paid LPGA $170,000 more in Guarantees than it received in royalties from the licensees it procured.  (Def.'s 56.1 ¶ 9; Pl.'s Response to 56.1 ¶ 9.)  The only year Summit's receipts exceeded the Guarantees it paid was 2003. (Def.'s 56.1 ¶¶ 6, 7.)  In December 2005, Summit made a series of projected revenues in connection with a business plan it shared with LPGA.  (Def.'s 56.1 ¶ 10.)  The December 15, 2005 "conservative" projections (the "Projections") are relied upon by Summit and its expert in the instant litigation.  (Def.'s 56.1 ¶ 12.)  The Projections predicted continued losses through 2007; however, beginning in 2008, the Projections anticipated that royalties would begin to exceed the Guarantees.  (Pl.'s 56.1 ¶¶ 13, 14.)  Five of the Summit representatives that had made the Projections were deposed: Geoffrey Holmes and Kenneth Wang, Summit's founders and principals; Sharlene Sones, who worked on the predictions for the United States; Matthew Holmes, who worked on the predictions for Canada and Europe; and Daniel Mao, who worked on the predictions for Asia. (Def.'s Mem. Summ. J. 4.)  The Projections did not use a specific growth rate but rather "assumed conservative growth."  (M. Holmes Dep. at 114:8-18.)

In June 2006, LPGA sent Summit a notice that it was terminating Summit as LPGA's exclusive licensing representative for alleged breaches.  (Def.'s 56.1 ¶ 26.) Summit rejected the notice, and in September 2006 Summit sent LPGA a notice extending the Agreement.  (Pl.'s 56.1 ¶ 28.)  Summit did not pay LPGA any Guarantee payments after June 2, 2006, the date of LPGA's termination notice.  (Def.'s Response to 56.1 ¶ 30.)  Summit filed the instant suit in November 2007.

## II.  Standard of Review

A court may only grant a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court looks to the substantive law to identify which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  An issue is genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Id.* at 249-50.

To show the existence of a genuine issue, the nonmoving party must have more than a scintilla of evidence to support its position.  *Id.* at 252.  "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some

3

hard evidence showing that its version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).  In evaluating cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The court must draw all inferences in favor of the non-moving party.  *Id.*

### III.    Discussion

#### a.  LPGA's Motion for Partial Summary Judgment

Defendant moves for partial summary judgment dismissing six of Plaintiff's claims: (1) breach of contract insofar as it seeks damages for lost profits; (2) breach of contract insofar as it seeks damages relating to Golfsmith, a potential licensee; (3) breach of contract insofar as it seeks damages after December 31, 2006; (4) a permanent injunction; (5) declaratory judgment; and (6) unjust enrichment for the period before June 2, 2006.[1]

#### i.  Lost Profits

In order to recover loss of future profits as damages for breach of contract under New York law,[2] the plaintiff must establish the existence and the amount of lost profits with reasonable certainty, and that the lost profits were within the contemplation of the parties at the time the contract was made.  *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (*citing Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986) ("*Kenford I*")).  To meet this burden, the plaintiff must establish (1) the existence of the lost profits

---

[1] Summit states in its Opposition that it seeks unjust enrichment as to the "benefits accruing to LPGA following the termination of the Agreement."  (Pl.'s Opp. Summ. J. at 27) (emphasis in original).  The parties do not dispute this issue; LPGA's motion for summary judgment as to any unjust enrichment claims prior to June 2, 2006 is granted.

[2] The parties do not dispute that New York law governs this diversity action.

with reasonable certainty, and (2) that the alleged loss is capable of proof with reasonable

certainty. *Kenford I*, 67 N.Y.2d at 261.  "[T]he damages may not be merely speculative,

possible or imaginary, but must be reasonably certain and directly traceable to the breach,

not remote or the result of other intervening causes." *Id*; *see also 3497 Austin Boulevard*

*Assoc. LLC v. M.K.D. Capital Corp.*, No. 04 Civ. 8596 (NRB), 2007 WL 1575265, at *2

(S.D.N.Y. May 30, 2007) ("Projections of future profits which are made on the basis of a

'multitude of assumptions' that require 'speculation and conjecture' with few known

factors do not provide the requisite certainty for recovery.").  Additionally, "evidence of

lost profits from a new business venture receives greater scrutiny because there is no

track record upon which to base an estimate." *Schonfeld*, 218 F.3d at 172.

Summit need not establish the exact amount of lost profits; it "need only provide

the jury with a sound basis for approximating with reasonable certainty the profits lost as

a result" of LPGA's actions.  *S&K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 853 (2d Cir.

1987).  Accordingly, LPGA can prevail on its motion for summary judgment on the issue

of lost profits only if Summit has failed to raise a genuine issue of material fact as to the

*existence* of lost profits.[3]  *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90 Civ. 4091

(PKL), 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993).  For the following reasons, we

find that Summit has failed to raise a genuine issue as to the existence of lost profits.

Courts have repeatedly found that where the existence of lost profits rests on a

multitude of assumptions, the plaintiff has failed to establish the existence of lost profits

to a reasonable certainty.  *See Schonfeld*, 218 F.3d at 173 (affirming the district court's

decision that the expert's projections, which were based on a "seemingly endless list of

---

[3] The parties do not dispute that lost profits were within the contemplation of the parties when the contract was made.

assumptions," were insufficient to establish lost profits to a reasonable certainty);

*Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993)

("[Plaintiff's] lost profits presentation depended entirely on speculation of a particularly

dubious kind.  [Plaintiff's accounting expert] assumed an abrupt expansion of the market

for trademark search services, assumed that [Plaintiff] would reverse the long decline in

its market share, assumed that [Plaintiff's] historically aggressive competitors would take

no measures to counter [Plaintiff's] ascendancy, and predicted which choices customers

would make among a variety of new and old search technologies—all of these

assumptions reduced to speciously exact dollar amounts and spun out to the year 1998.");

*Bessemer Trust Co., N.A. v. Branin*, 544 F. Supp. 2d 385, 389-90 (S.D.N.Y. 2008)

(rejecting the plaintiff's lost profits theory because it relied on a "multitude of

assumptions," including assumptions regarding the rates of return of managed assets,

additions of new assets to the portfolio, variable costs, discount rates, and the length of

relationship).

   Similarly, in the instant case the Projections rely on a "host of speculative

assumptions and few known factors."  *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395,

405-06 (1993).  Aside from the 2006 numbers, the Projections relied on licenses that did

not exist yet.  (Singer Dec. Ex. C ("G. Holmes Dep.") at 161:21-162:6.)  Not one of the

five Summit representatives, who helped create the Projections, could explain the

assumptions and specific growth rates used in creating the Projections for the years 2007

to 2010.  (M. Holmes Dep. at 114:8-18; Mao Dep. at 141:2-17.)  The Projections did not

use a specific growth rate but rather "assumed conservative growth."  (M. Holmes Dep.

at 114:8-18.)  The licenses anticipated in the Projections include contracts in regions,

such as Asia, and merchandise, such as DVDs, where Summit had never previously obtained licenses.  (G. Holmes Dep. at 117:18-24; 121:21-24; 126:19-127:16.)  The Projections also assumed that if there was a guarantee amount under the license, it would be paid in full to Summit, (M. Holmes Dep. at 120:4-12), despite the fact that licensees repeatedly failed to pay the guarantees to Summit in the past.  (G. Holmes Dep. at 112:18-113:8; M. Holmes Dep. at 67:13-68:3.)

Summit has not offered any evidence that suggests that the Projections or, more generally, the existence of lost profits is anything more than merely speculative.  From 2002 to 2006, Summit was the exclusive licensing agent for LPGA.  During that time Summit repeatedly failed to collect more in royalties than it had to pay in Guarantees. Through 2005, Summit had paid $170,000 more in Guarantees than it had collected in royalties.  Even under Summit's own highly speculative Projections, Summit would not have made a profit until 2008.  These facts demonstrate that the Projections, which rely on a "multitude of assumptions," do not raise a genuine issue of fact as to the existence of lost profits.  *Bessemer*, 544 F. Supp. 2d at 389.

Summit contends that given the unique nature of the Agreement and the atypical risk allocation encompassed in it, the Court should use an approach adapted to these specific circumstances in assessing lost profits.  (Pl.'s Supp. Mem. 7.)  Specifically, Summit urges a tailored approach, where the Court looks to Summit's profits independent of the Guarantee obligations under the contract.  (Pl.'s Supp. Mem. 7.) Looking at the Agreement as a whole, it is clear the parties put in place certain features that were meant to mitigate the risk Summit assumed under the contract.  The Agreement anticipated the early growth years; and, therefore, the Guarantees that Summit paid

LPGA in the first three years after the U.S. expansion—$480,000, $480,000, and $500,000—were substantially lower than in the subsequent years—$630,000, $715,000, $800,000, and $895,000.  (Agreement ¶ 3(b)(i).)  Summit was also given a unilateral right to terminate the contract in March 2005 if the business was not developing or for any other reason.  (Agreement ¶ 18.)  Finally, as discussed in more detail below, paragraph 15 of the Agreement (the "Tail provision") provides that Summit is entitled to recover royalties for three years after the termination or expiration of the Agreement. (Agreement ¶ 15.)

Summit's contention that LPGA anticipated that Summit would take losses in the early years and then "thwarted" the receipt of profits is an unsupported inference, especially considering the royalties Summit was entitled to under the Tail provision.  The graduated increase in the Guarantees suggests that lower Guarantees existed in the early years, so that Summit would be able to obtain profits; as the business was expected to grow, the Guarantees also grew.  The slow growth and risky nature of the Agreement was anticipated by the sophisticated parties, and provisions were incorporated to address these issues.  LPGA's motion for summary judgment for breach of contract as to lost profits only is granted.[4]

### ii.  Golfsmith

LPGA next seeks summary judgment on Summit's breach of contract claim insofar as Summit seeks damages relating to Golfsmith, a potential licensee.  Summit does not argue that Golfsmith ever submitted a deal proposal or that the parties had

---

[4] As a result of this grant of partial summary judgment, LPGA's motions *in limine* Numbers 2 through 4 are moot.

agreed to any specific terms; rather, Summit contends that but for LPGA's interference the deal would have gone forward.

Summit argues that the negotiations with Golfsmith were stalled as a result of LPGA's intentional interference.  Summit puts forth no evidence to support the allegation that but for LPGA's interference the deal with Golfsmith was likely to come into fruition. (Pl.'s Opp. Summ. J. 22.)  Summit's reliance on the "test run in which LPGA's product sold out of Golfsmith's stores" to demonstrate that a deal with Golfsmith was imminent is unavailing.  (Pl.'s Opp. Summ. J. 22.)  The test run was in 2004-2005 and related to a licensing arrangement that Summit had with a different licensee, RMP Benchmark.  (G. Holmes Dec. ¶¶ 65-66.)  This test run , which occurred prior to any negotiations with Golfsmith and involved a third-party, is not evidence that a deal with Golfsmith was imminent.  Summit has failed to offer any evidence that there is a genuine issue of fact that the Golfsmith deal was imminent.  Additionally, for the reasons discussed in the previous section, lost profits related to the deal are too speculative.  Summit is precluded from seeking any damages related to the possible Golfsmith deal.[5]

### iii.  Post-December 31, 2006 Damages

LPGA argues that, even if it breached the agreement in June 2006, Summit is precluded from recovering any damages after December 31, 2006 because Summit affirmed the contract and then breached that contract by failing to pay the December 31, 2006 guarantees.  While we agree with LPGA that any agreement with Summit was

---

[5] As a result, LPGA's motion *in limine* Number 1 is now moot.

terminated no later than December 31, 2006, this finding does not preclude Summit from recovering post-termination royalties.[6]

Upon LPGA's breach of the Agreement, Summit had two options: "(1) it could have stopped performance and sued for total breach; or (2) it could have affirmed the contract by continuing to perform while suing in partial breach." *ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991); *see also Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1011-12 (S.D.N.Y. 1995). If Summit affirmed the contract, it would have been obligated to perform all of its obligations under the Agreement. *See ARP Films*, 952 F.2d at 649 (having affirmed the contract through performance of certain contractual duties and benefits, plaintiffs breached the contract when they failed to pay defendants the distribution proceeds owed under the contract). We need not resolve whether Summit actually affirmed the contract. If Summit did not affirm the contract, the agreement terminated June 2006. The Agreement would only exist post-December 31, 2006, if Summit did, in fact, affirm the Agreement, or extend it by the September notice. If Summit affirmed the contract, it breached by failing to pay the Guarantee in December.[7]

To the extent LPGA is seeking a determination that the Agreement with the parties ended no later than December 31, 2006,[8] its motion is granted.[9] However, as discussed *infra* Part III.b.ii., Summit is entitled to royalties under the Tail provision upon expiration or termination of the Agreement, even if the contract was terminated due to

---

[6]Summit's briefing focuses on the availability of post-termination royalties. However, given that Summit does argue in other instances that the Agreement continued past the LPGA's June termination notice, we find it necessary to determine whether the Agreement was terminated no later than December 31, 2006.

[7] Summit concedes as much in its Supplemental Memorandum. (Pl.'s Supp. Mem. 3) ("As soon as [Summit] missed a guarantee payment, it could, under the contract, no longer be LPGA's licensing agent.").

[8] The issue of whether the Agreement was breached prior to that date is not currently before us.

[9] Summit does not allege that LPGA affirmed the contract after December 31, 2006.

Summit's material breach.  Thus, even if Summit breached the agreement in December, it would still be entitled to post-termination royalties.  LPGA's motion to preclude the recovery of any post-December 31, 2006 damages is denied.

### iv.  Permanent Injunction

Summit seeks a permanent injunction, which would prevent LPGA from using its own trademark.  Summit concedes that it does not own the trademarks but contends that LPGA should be restrained from soliciting, negotiating or obtaining new licenses, other than through Summit.  To obtain an injunction, a party must succeed on the merits of its claim, as well as establish irreparable harm and inadequacy of legal remedies.  *Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  LPGA contends that, even if Summit were to succeed on the merits, it would not be entitled to injunctive relief because Summit does not own the mark in question, and the only damage it has suffered is loss of royalties and equitable remedies are not warranted to protect what would be a purely monetary interest.  (Def.'s Reply Summ. J. 15.)

In briefing this issue, Summit failed to make any specific showing as to irreparable harm or absence of an adequate remedy at law.  The Complaint alleges that LPGA's merchandising and licensing of its own mark has caused Summit irreparable harm for which there is no adequate remedy at law.  (Compl. ¶¶ 70, 72.)  Specifically, Summit alleges irreparable harm in that LPGA has "destroyed [Summit's] relationships with whom it had the exclusive right to deal."  (Compl. ¶ 71.)  Summit puts forth no factual evidence to support this allegation.  Presumably, Summit's relationships were "destroyed" because LPGA prevented Summit from representing LPGA in negotiations after its June termination.  This fact simply does not support the allegation and does not

constitute a showing adequate to support injunctive relief. Summit has failed to sufficiently identify an irreparable harm, or even argue why the remedies at law are inadequate. Summit's claim for injunctive relief is dismissed.

### v. Declaratory Judgment

The Court of Appeals for the Second Circuit has held that a declaratory judgment action should be entertained "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir. 1992). Where the declaratory judgment is duplicative of the breach of contract claim, neither of these purposes is served. *Id.*; *see also Intellectual Capital Partner v. Institutional Credit Partners LLC*, No. 08 Civ. 10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. Jul. 8, 2009) (declaratory judgment would "serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim"); *Camofi Master LDC v. College Partnership, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (dismissing the declaratory judgment claim where the "question of the parties' obligations to one another will all be resolved in the context of [the breach of contract] claims").

Despite Summit's allegations, no "cloud" exists over the parties' business activities. Summit has not acted as LPGA's representative since 2006; furthermore, Summit has chosen to litigate its rights through its breach of contract claim. *Intellectual Capital Partner*, 2009 WL 1974392, at *6 ("Any 'cloud of uncertainty' regarding the scope and enforceability of the provisions will be dispelled in litigation of the breach of contract claim, which also provides for damages."); *Camofi*, 452 F. Supp. 2d at 480

(finding no cloud of uncertainty where "[t]he parties have already chosen to pursue their coercive remedies and [the party seeking a declaratory judgment] has not been left awaiting the initiation of legal proceedings while damages accrue").  The issue of LPGA's alleged breach, and the parties' obligations to each other, will be resolved in the context of the breach of contract claims.  Summit's claim for a declaratory judgment is dismissed.

### b.   Summit's Motion for Partial Summary Judgment

Summit moves for partial summary judgment on three of LPGA's counterclaims: breach of fiduciary duty, conversion, and money had and received.

### i.   Breach of Fiduciary Duty

In New York, in order to establish a breach of fiduciary duty, there must be a fiduciary duty owed.  *SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir. 2004). The Agreement contains explicit language that the parties are not fiduciaries. (Agreement ¶ 14) ("Nothing herein contained shall be construed to place the parties in the relationship of partners, joint ventures, principal and agent, or fiduciaries. . . .").  "It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed."  *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995).  As a result, when the terms of the contract are clear and unambiguous, the contract should be enforced according to those terms.  *Id.*

Courts have repeatedly applied this basic principle of contract law in the context of fiduciary disclaimers.  *See Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir. 1998) (dismissing the breach of fiduciary duty claim because the waiver was sufficiently explicit and the plaintiffs "may not sue upon a duty that was expressly excluded from the

Agreement"); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004) ("Because contractual disclaimers of fiduciary duty are effective in New York, no fiduciary duty can arise from the relationship between the Seippels and Deutsche Bank."); *Asian Vegetable Research and Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F. Supp 1169, 1178 (S.D.N.Y. 1996) (finding no fiduciary relationship existed where the parties had entered into a contract that "clearly and unambiguously disclaims a fiduciary relationship").  Given that the Agreement contains a clear and unambiguous disclaimer of a fiduciary relationship, we find there was no fiduciary duty between the parties.

LPGA claims that it allowed Summit to continue to act on its behalf in a limited capacity after the June termination, and this post-termination relationship created a fiduciary duty that is not governed by the parties' Agreement.  (Def.'s Opp. Summ. J. 1-2.)  This argument is directly contradicted by LPGA's representations to the Court at oral argument that no relationship existed between the parties after LPGA's termination notice.[10]  Even disregarding these representations, the evidence before us does not suggest that a new fiduciary relationship was created by the post-termination relationship. Drawing all inferences in favor of LPGA, the evidence suggests a situation analogous to *ARP Films*, *supra* Part.III.a.iii, where the non-breaching party allowed the breaching party to act in a limited capacity after the termination and, in doing so, affirmed the

---

[10] "THE COURT: And then after the termination you worked together in some relationship which the nature of which is disputed.
MR. RUBIN: Well, we didn't really work together.  They were in the middle of negotiating with one party in England and they kept going and we kept trying to say to them would you please stop and give us the information on how to contact these people. . . .
THE COURT: You didn't tell them to cease and desist any activity.
MR. RUBIN: We absolutely did.  We will be able to show e-mails from Eve Wright, then head of licensing and general counsel very much telling them to stop that we don't want them doing this.  We want to do it on our own."  (T. at 19:22-20:18.)

contract.[11]  *ARP Films*, 952 F.2d at 647.  As the evidence does not suggest the creation of a fiduciary duty; LPGA's counterclaim for breach of fiduciary duty is dismissed.

### ii.  Conversion and Money Had and Received

LPGA's third and fourth claims are for conversion and money had and received, respectively.  These claims relate specifically to the post-termination royalty payments, approximately $224,000, which Summit is currently holding.  Summit maintains that LPGA has no right to these payments under the Agreement and the claims should be dismissed.  The Tail provision provides that upon termination or expiration of the Agreement, Summit will "continue to receive and retain all amounts which it is entitled to receive or retain . . . for a period of three years following expiration or termination of this Agreement . . . and, in addition, 30% of such amounts for one (1) additional year thereafter, except as otherwise provided in this Section."  (Agreement ¶ 15.)  LPGA argues that the Tail provision does not apply to terminations for material breaches, and, therefore, Summit has no right to post-termination royalties.

 "Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms."  *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, 325 (2007).  "The court should 'construe the agreements so as to give full meaning and effect to the material provisions.'"  *Id.* (*quoting Excess Ins. Co. Ltd. v Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 582 (2004)).  "A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties."  *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y.

---

[11] In fact, LPGA makes this very argument in the context of its own summary judgment motion, in which it alleges that after affirming the contract Summit was obligated to perform all of its contractual obligations. (Def.'s Mem. Summ. J. 22-23.)

App. Div. 2008) (*citing Teichman v Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520

(1996); *Morlee Sales Corp. v Manufacturers Trust Co.,* 9 N.Y.2d 16, 19 (1961)).  If the

meaning of a contract is clear on its face, "a court is not free to alter the contract to reflect

its personal notions of fairness and equity."  *Greenfield v. Philles Records, Inc.*, 98

N.Y.2d 562, 570 (2002).

  The Tail provision applies following "expiration or termination" of the

Agreement.  (Agreement ¶ 15.)  LPGA could only terminate for cause.  (Agreement ¶¶

16, 18.)  The Agreement describes the "Events of Default" that would permit the parties

to terminate the contract prior to expiration.  (Agreement ¶ 16.)  These events include

default "in the payment of any sum due under the Agreement" and default "in the

performance or observance of any of the material non-monetary terms, agreements,

covenants or conditions of this Agreement."  (Agreement ¶¶ 16(a)(i)-(ii).)  Upon the

occurrence of an event of default, the non-defaulting party had the right to terminate the

contract and was entitled to all remedies available at law or equity.  (Agreement ¶ 16(b).)

The Tail provision states that "[u]pon termination or expiration, all rights of SPI will

terminate" except its rights to post-termination royalties.  (Agreement ¶ 15.)

  The clear language of the contract contemplates that termination will include

termination for breaches of the Agreement.  This interpretation of the Agreement is

consistent with the overall intent of the parties to put in place certain protections for

Summit, who was entering a risky venture as LPGA's representative.  *See supra* Part

III.a.i.  Based on the unambiguous language of the Agreement, we find that "termination"

in paragraph 15 includes termination for breaches of the Agreement. LPGA's counterclaims for conversion and money had and received are dismissed.[12]

## IV.    Conclusion

LPGA's motion for partial summary judgment is denied in part, granted in part. LPGA's four motions *in limine* are now moot. Summit's motion for partial summary judgment is granted in its entirety. The parties are directed to submit to the Court in writing within thirty (30) days of this order a schedule for further proceedings in this case.

**SO ORDERED.**

Dated: _June 14_, 2010
        New York, NY

_____
U.S.D.J.

___
[12] Having found the Tail provision applicable even in instances of termination for breach, Summit's failure to pay the December 2006 Guarantees is not relevant.