UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUMMIT PROPERTIES INTERNATIONAL, LLC, | 07 Civ. 10407 (LBS) |
| Plaintiff, | |
| v. | **MEMORANDUM<br>& ORDER** |
| LADIES PROFESSIONAL GOLF ASSOCIATION, | |
| Defendant. | |

SAND, J.

Plaintiff Summit Properties International, LLC ("Summit") was the exclusive

licensing agent for Defendant Ladies Professional Golf Association ("LPGA") from 1999

until 2006.  In 2006, LPGA terminated the relationship with Summit.  Summit filed this

diversity action for breach of contract on November 16, 2007.  On May 22, 2009, both

Summit and LPGA filed motions for partial summary judgment; LPGA also filed four

motions *in limine*.  On June 14, 2010, this Court granted Summit's motion for partial

summary judgment in its entirety and granted in part LPGA's motion for partial summary

judgment, rendering LPGA's motions *in limine* moot.  On August 20, 2010, LPGA filed

three new motions *in limine*.

For the reasons stated below, LPGA's motions *in limine* are granted in part, and

dismissed in part as moot.

**I.  BACKGROUND**

The facts of this case are fully recited in this Court's Memorandum and Order

dated June 14, 2010.  *Summit Properties Intern., LLC v. Ladies Professional Golf Ass'n*,

No. 07 Civ. 10407 (LBS), 2010 WL 2382405 (S.D.N.Y. June 14, 2010).  A brief outline

of the facts and procedural history follows.

In 1999, Summit and LPGA entered into a Representation Agreement, which

appointed Summit as the exclusive licensing representative of LPGA and its trademarks

outside of the United States.  In 2002, the parties executed the Amended and Restated

Representation Agreement, which expanded Summit's role to include the United States.

Singer Dec., Ex. C ("Agreement").  Summit was required to pay LPGA annual payments

("Guarantees") regardless of the royalties Summit collected from licensees.  Def. 56.1 ¶2.

These payments ensured that LPGA would receive a minimum amount of revenue.  In its

tail provisions, the Agreement also provided that upon its termination or expiration,

Summit would continue to receive royalties for a period of three years, and 30% of such

amounts for one additional year thereafter.  Agreement  ¶15.

On June 2, 2006, LPGA sent Summit a notice that it was terminating Summit as

its exclusive licensing representative due to alleged breaches.  Def. 56.1 ¶26.  Summit

rejected the notice and sent LPGA a notice in September 2006 extending the Agreement.

Pl. 56.1 ¶28.  Summit did not pay LPGA any Guarantee payments after June 2, 2006.

Def. Response to Pl. 56.1 ¶30.  As of December 31, 2005, Summit had collected

$1,543,741.31 in royalties under the Agreement, and paid LPGA $1,700,000 in

Guarantees.  Pl. 56.1 ¶¶17–18.  Summit had received $541,540.69 in post-2005 royalties

as of May 22, 2009.  Pl. 56.1 ¶20.

Summit filed the instant suit on November 16, 2007, alleging breach of contract

and unjust enrichment, and seeking damages of not less than $5 million, a declaratory

judgment, and an injunction forbidding LPGA from further breach of the Agreement.

Compl. ¶¶9–83.  In its Answer filed on January 14, 2008, LPGA filed five counterclaims alleging breach of contract, breach of fiduciary duty, conversion, money had and received, and tortious interference with business relations.  Answer ¶¶66–93.  Summit alleged that LPGA had interfered with a deal between Summit and Golfsmith, a potential licensee.  Pl. Mem. Opp. Def. Mtn. Sum. J. at 12, 22.

At summary judgment, this Court dismissed Summit's claim for breach of contract as to lost profits, and precluded Summit from seeking any damages relating to the possible Golfsmith deal.  *Summit v. LPGA*, 2010 WL 2382405 at *4–5.  LPGA argued that Summit was precluded from recovering post-termination royalties; the Court ruled that the Agreement between the parties ended no later than December 31, 2006, and that Summit was entitled to post-termination royalties pursuant to the tail provisions in the Agreement.  *Id.* at *5.  The Court also denied Summit's requests for a declaratory judgment and a permanent injunction preventing LPGA from using its own trademark. *Id.* at *6.  Summit moved for partial summary judgment on three of LPGA's counterclaims: breach of fiduciary duty, conversion, and money had and received.  The Court granted Summit's motion and dismissed the three counterclaims.  *Id.* at *7–9.

**II.  DISCUSSION**

LPGA's first two motions *in limine* seek to bar Summit from offering evidence or arguments regarding theories of (1) restitution damages and (2) reliance damages.  LPGA argues that even if breach is assumed, Summit cannot recover on these theories of damages as a matter of law, obviating the need for a trial.  Should the Court allow Summit to proceed on these theories, LPGA's third motion *in limine* requests that Summit be precluded from introducing certain evidence on expenses it allegedly

incurred, because of the prejudicial effect of Summit's alleged failure to provide complete discovery on this issue.

### A.  Legal Standard

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Courts "have entertained such motions on the eve of trial as procedural devices designed to narrow the issues to be presented to the jury." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 517 F. Supp. 2d 662, 667 (S.D.N.Y. 2007) (internal citation and quotation marks omitted).   Motions *in limine* are appropriate for evidentiary or "purely legal . . . non-record dependent legal issues, like those that could just as easily be raised in the Rule 12 context." *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307 (E.D.N.Y. 2010).

All relevant evidence is admissible, but "evidence which is not relevant is not admissible."  Fed. R. Evid. 402.  Relevant evidence may still be excluded if its probative value is substantially outweighed by, among other concerns, potential "confusion on the issues" or "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  "The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).  Trial courts are free to exclude inadmissible evidence *sua sponte*.  *HDM Flugservice GmBH v. Parker Hannifin Corp.*, 322 F.3d 1025, 1034 (6th Cir. 2003); *Maddox v. Patterson*, 905 F.2d

1178, 1180 (8th Cir. 1990) ("It is clearly within the trial court's discretion to exclude

evidence *sua sponte*.").

### B.  Timeliness of Summit's Theories of Restitution and Reliance Damages

When a party in a contract dispute fails to raise a new theory of damages until

after the close of discovery, the prejudice that results to the adversary can be sufficient to

preclude that theory from presentation at trial.  *See, e.g.*, *Point Prods. A.G. v. Sony Music

Entm't*, No. 93 Civ. 4001 (NRB), 2002 WL 31856951, at *4 (S.D.N.Y. Dec. 19, 2002)

(plaintiff's change of damages theory nine years into litigation resulted in prejudice to

defendant); *24/7 Records, Inc. v. Sony Music Entm't, Inc*., 566 F. Supp. 2d 305, 318

(S.D.N.Y. 2008) (plaintiff's offer of new damages theory in joint pre-trial order violated

disclosure requirements of Rule 26).  Here, LPGA asserts that Summit should be

precluded from offering theories of restitution and reliance damages because Summit did

not identify these theories of recovery in a timely manner, prejudicing LPGA by leaving

it unable to conduct discovery on them.

Summit's Amended Initial Disclosures pursuant to Fed. R. Civ. P. Rule

26(a)(1)(A)(iii), filed on October 30, 2008 ("Disclosures"), gave LPGA sufficient notice

of Summit's three theories of recovery.   The three categories in the Disclosures

correspond to Plaintiff's theories of restitution, expectancy, and reliance damages.[1]  The

first category, listing $2 million "in royalty payments earned in LPGA license

---

[1] LPGA argues that the phrase "under the Agreement," Singer Dec., Ex. H, at 8, appended to the first and
third categories of damages Summit alleged in the Disclosures, shows that these categories are not
equivalent to the equitable theories of restitution and reliance damages.  This argument is unavailing.  The
Agreement does not refer explicitly to reliance or restitution damages, and Summit's references to it denote
the rights and obligations for performance, not for damages.  LPGA also contends that Summit conceded
its right to recover through deposition testimony and in motion practice, but Summit correctly notes that
LPGA has taken these references out of context.  Finally, LPGA accuses Summit of abandoning its original
"recoupment theory" of damages for reliance and restitution theories, constantly shifting its arguments for
liability, but Summit never used the phrase "recoupment theory," and in current motion practice has only
offered theories of contractual restitution damages, reliance damages, and quasi-contract unjust enrichment.

arrangements," is the same sum as its current claim of restitution damages.  Singer Dec., Ex. H, at 8.  It potentially satisfies the legal definition of restitution as "the reasonable value of any benefit conferred upon the defendant by the plaintiff [.]"  *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992).  The second category refers to "lost opportunities to earn future royalty payments," the claim for lost profits resolved at partial summary judgment.  Singer Dec., Ex. H, at 8.  The third category refers to $1.25 million in "out-of-pocket expenses that [Summit] incurred in order to perform under the Agreement."  *Id.*  This sum corresponds to the over $1 million out-of-pocket expenses that Summit now claims as part of its reliance damages, and potentially satisfies the legal definition of such damages as "expenses of preparation and of part performance . . . incurred in reliance upon the contract."  *Bausch & Lomb*, 977 F.2d at 729.

Accordingly, the Court holds that Summit's theories of restitution and reliance damages were raised in a timely manner.  Amendment of the Complaint is not necessary to preserve these theories.

### C.  Summit's Theory of Restitution Damages

Under New York law,[2] restitution damages are available as an equitable remedy for repudiation or total breach of a contract.[3]  "Upon a demonstration that a defendant is liable for material breach, a plaintiff may recover the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him."  *Bausch & Lomb*, 977 F.2d at 729 (internal quotations omitted); *see also Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (N.Y. App. Div. 2001)

---

[2] The parties do not dispute that New York law governs this diversity action.
[3] This theory of restitution damages for breach of contract is distinct from Summit's theory of quasi-contract unjust enrichment recovery, discussed *infra* Section E.  *See* Restatement (Second) of Contracts § 4 cmt. b (1981) (distinguishing quasi-contracts from true contracts).

(awarding restitution for total breach of contract by non-performance); Restatement
(Second) of Contracts § 373(1) (1981) ("[O]n a breach by non-performance that gives
rise to a claim for damages for total breach or on a repudiation, the injured party is
entitled to restitution for any benefit that he has conferred on the other party by way of
part performance or reliance.").

  Summit claims that its potential restitution damages exceed $2 million, citing a
$565,000 Guarantee payment it made in January 2006 as an example.  Summit adds that
this example "is not the only restitution interest that Summit potentially can recover," but
insists that the precise amount of its restitution interest is a factual matter that cannot be
resolved as a matter of law.  Pl. Mem Opp. Mtn. *in limine* ("Mtn.") at 9.  Here, Summit
attempts to create a genuine issue of material fact by declining to allege its claimed
restitution damages in sufficient detail.  However, Summit has already specified the
amount of restitution damages in its Amended Initial Disclosures.  Having argued that the
Disclosures' computation of "$2,000,000 in royalty payments earned in LPGA license
arrangements" preserved its claim for restitution damages, Summit cannot now argue that
the amount of damages for that claim is unknown or creates a genuine issue of material
fact.  Singer Dec., Ex. H, at 8.  Summit has already disclosed that it has received
$2,085,282.00 in royalty payments as of May 2009.  Pl. 56.1 ¶¶18, 20.

  The parties dispute whether the amount of restitution damages equals the total
royalties earned by Summit or the $1.7 million in Guarantees that Summit paid to LPGA.
Summit's claim for recovery of the total royalties is misplaced, since a plaintiff
recovering restitution damages receives "the reasonable value of services rendered, goods
delivered, or property conveyed" to the other party.  *Bausch & Lomb*, 977 F.2d at 729;

*see also Waxman v. Envipco Pick Up & Processing Servs., Inc.*, 02 Civ. 10132 (GEL), 2006 WL 236818, at *4 (S.D.N.Y. Jan. 17, 2006) (plaintiff "receives value of the benefit conferred to the other party.").  Here, Summit has not alleged that it remitted any sum of the royalties in excess of the Guarantees to LPGA.[4]  Therefore, Summit's claim of restitution damages must be based solely upon the $1.7 million in Guarantees remitted to LPGA.

However, Summit's claim must also be offset by the "reasonable value of any counter-performance received by" the plaintiff. *Bausch & Lomb*, 977 F.2d at 729.  In *Bausch & Lomb*, the Second Circuit found that where a distributor made a payment to a manufacturer for exclusive distribution rights, those rights constituted "a benefit the value of which must be offset" against royalty payments remitted to the manufacturer and awarded to the distributor in restitution, and that "the value that the parties ascribed to a benefit in their contract may be the best valuation available to the court." *Id.* at 730.  These facts and principles fit precisely with the instant case.  While Summit paid $1.7 million to LPGA, it also received $2,085,282.00 in royalties as a result of exercising the exclusive rights granted by LPGA.  As a result, Summit earned $385.282.00 more than it paid to LPGA.  Under the terms of the Agreement's tail provision, Summit has received

---

[4] The Agreement provided that royalties would be first apportioned to Summit's recoupment of its payments to LPGA, then to payments of Summit's share of royalties until both LPGA's and Summit's shares of royalties were equal, and then distributed according to LPGA's and Summit's respective shares of royalties.  According to those shares, Summit was entitled to 50% of royalties earned if the total was less than twice the Final Guarantee Amount of $8,531,195.00, and 40% of royalties in excess of that amount.  Agreement ¶¶3(a)–(b)(i).  In the event of termination, Summit would be entitled to retain the entirety of subsequent royalties received for a period of three years, and 30% of such amounts for an additional year thereafter.  Agreement ¶15.  Summit received $541,540.69 in royalties between December 31, 2005 and May 22, 2009 (the date Summit filed its Rule 56.1 statement).  Pl. 56.1 ¶20.  The amount of this sum owed to LPGA depends on the date of breach, which Summit alleges took place no later than June 2, 2006 (the date of LPGA's termination notice) and LPGA alleges took place no later than December 31, 2006.  Presumably, Summit's argument that the amount of restitution damages presents contested factual issues relates to this calculation.  However, as stated *supra*, Summit has not alleged that it actually paid any amount in excess of the Guarantees to LPGA.

even more in royalties.  Summit's claim for restitution damages is completely offset by the counter-performance it has received, and it can therefore recover nothing under a restitution theory of damages.

Summit argues that such calculations of damages ignore the harm caused by LPGA's alleged breach and fail to compensate Summit for that harm.  Emphasizing that restitution is an equitable remedy unconstrained by the terms of the contract, it urges the Court to award damages "from whatever source" in order to avoid an "unjust result."  Pl. Mem. Opp. Mtn. at 15.  These arguments are unavailing.  Restitution damages for breach aim "to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms."  *In re Asia Global Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009). Awarding Summit the Guarantees paid to LPGA, when it has already earned back that expenditure through royalties, would not restore Summit to its *status quo ante*.  Instead, it would constitute a windfall, the receipt of an additional $1.7 million.  "An award of restitution cannot provide a windfall to the non-breaching party."  *American Capital Corp. v. F.D.I.C.*, 472 F.3d 859, 870 (Fed. Cir. 2006).  Moreover, the Agreement explicitly states that the Guarantees were Summit's "[c]onsideration" paid to LPGA for the right to procure licenses for the latter's trademarks and earn royalties, not a benefit that Summit bestowed on LPGA.  Agreement ¶3.  The Guarantees were part of the bargain Summit struck with LPGA, and in return Summit received value in the form of valuable licensing rights from which it earned royalties even after termination of the Agreement.  Therefore Summit is not entitled to restitution damages as a matter of law.

Accordingly, the Court holds that Summit is precluded from offering evidence or theories of restitution damages at trial.

### D.  Summit's Theory of Reliance Damages

Under New York law, reliance damages are also available as an equitable remedy for breach of contract.  *Farash v. Sykes Datatronics, Inc.*, 59 N.Y.2d 500, 504–5 (1983). They allow a plaintiff to recover "his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."  *Bausch & Lomb*, 977 F.2d at 729.  Reliance damages, like restitution damages, are intended to "place plaintiffs in the same position as they were prior to the execution of the contract[.]"  *V.S. Intern., S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994); *see also* Restatement (Second) of Contracts § 344(b) (1981) (damages for "reliance interest" put promisee "in as good a position as he would have been in had the contract not been made").

Summit now cites two types of expenses as reliance damages: (1) out-of-pocket expenses under the Agreement, which Summit claims exceeded $1 million, and (2) the $1.7 million in Guarantees paid to LPGA.[5]  But as LPGA points out, Summit in its Amended Initial Disclosures claimed only $1.25 million as "out of pocket expenses that [it] incurred to in order to perform under the Agreement," a category that corresponds to reliance damages.  Singer Dec., Ex. H, at 8.  As with its claim for restitution damages, Summit cannot create a contested issue of material fact by altering its claim for reliance damages at the eleventh hour before trial.  Moreover, the Guarantees do not fit the

---

[5] Summit here claims that it paid $2.2 million in Guarantees to LPGA, following allegations made in the Complaint.  Compl. ¶58.  However, in its Rule 56.1 Statement, Summit declared that while it was obligated to pay $2.2 million in Guarantees, it actually paid $1.7 million, with an additional $518,125 credited to Summit by LPGA, and $14,375 waived by LPGA.  Pl. 56.1 ¶17.

definition of reliance damages as "foreseeable expenses legitimately made for performance of the agreement[.]" *24/7 Records*, 566 F. Supp. 2d at 319.  The Guarantees were Summit's consideration paid to LPGA for the right to procure licenses for the latter's trademarks and earn royalties, as discussed earlier; they were not Summit's out-of-pocket expenses incurred for performance.  Summit also argues that the Guarantees were payments made in reliance on the promise of future licensing rights.[6]  However, Summit paid the Guarantees in part using royalties it had already received through the exercise of its licensing rights during the preceding year.  Summit had already received the benefit of its bargain—the licensing rights granted by LPGA—and paid the Guarantees as consideration for that benefit.  Summit has since recouped the entire sum of Guarantees it paid to LPGA.  Under these circumstances, awarding the Guarantees to Summit would not fulfill the purpose of reliance damages—to put the nonbreaching party in the position it occupied "prior to the execution of the contract," *V.S. Intern.*, 862 F. Supp. at 1198.  Therefore, as a matter of law, Summit may only allege its out-of-pocket expenses in its claim for reliance damages.

Even this damages claim fails because Summit's efforts in reliance on the Agreement have not been wasted by any alleged breach.  Where a non-breaching party continues to receive benefits under the terms of the contract, compensation for the initial

---

[6] Summit highlights its final Guarantee payment of $565,000, paid in January 2006 to satisfy the Guarantee requirement for 2005, portraying it as a "payment made by Summit in reliance on LPGA's promise of exclusive representation rights."  Pl. Mem. Opp. Mtn. at 12.  But this argument fails for the reasons noted above; the Guarantees were consideration paid for the right to license LPGA's trademarks during the preceding year, not payments made for future rights.  Summit also claims that LPGA received this payment "just days before LPGA suspended that representation," hinting that LPGA deliberately delayed its suspension until after receiving the money.  *Id.*  Summit formally presented its strategic marketing plan to LPGA in January 2006, the same month it remitted the 2005 Guarantee payment. Compl. ¶47.  LPGA sent a letter to Summit dated February 6, 2006, requesting that Summit answer a list of questions concerning its marketing plan and refusing to consider further deals until it did so.  The timing of this letter does not demonstrate that LPGA deliberately delayed its suspension until receiving payment; it merely constituted a response to Summit's presentation of its marketing plan.  LPGA did not send a notice of termination until June 2006.

expenses that enabled those benefits would not restore plaintiffs to their *status quo ante*, "as reliance damages are intended to do, but would instead constitute a windfall for plaintiffs." *V.S. Intern.*, 862 F. Supp. at 1198.  In other words, reliance damages are available only for efforts "rendered useless" as a consequence of the breach.  *Id.*; *see also Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD*, No. 91 Civ. 4739 (LAP), 1994 WL 733688, *15 n.6 (S.D.N.Y. June 9, 1994) (reliance damages available "only for wasted efforts"); *Lieberman v. Templar Motor Co.*, 236 N.Y. 139, 149 (1923) (Cardozo, J.) (damages include expenses "reasonably made in part performance of the contract, to the extent that they are wasted if performance is abandoned").  Here, Summit's efforts under the Agreement were far from wasted.  On the contrary, Summit received $2,085,282.00 in royalty payments as of May 2009, and continued to receive further undisclosed amounts until the expiration of the tail provisions.  Pl. 56.1 ¶¶18, 20.  While the record does not indicate whether Summit has or will eventually recoup all of its alleged out-of-pocket reliance expenses in addition to the Guarantees, such recoupment is not necessary to find that its efforts were not wasted or rendered useless.  In *V.S. International v. Boyden World Corp.*, this Court found that the plaintiffs' efforts were not wasted where they "had increased revenue for the year after the contract was terminated" and managed the "continued running of a successful business," even though there was no finding that the plaintiffs had fully recouped their expenses.  *V.S. Intern.*, 862 F. Supp. at 1198.  Similarly, Summit's revenues increased after termination of the Agreement, due in part to the tail provisions granting it 100% of its royalties and relief from any obligation to pay Guarantees to LPGA.  In short, Summit has "continued to receive the benefits of [its] investment, and [has] shown no actual damages."  *Id.*

Accordingly, the Court holds that Summit is precluded from offering evidence or theories of reliance damages at trial.

### E.  Summit's Quasi-Contract Unjust Enrichment Claim

Summit alleges a quasi-contract claim of unjust enrichment, also known as *quantum meruit*, distinct from its theory of restitution damages for breach of contract.  To recover under such a claim, "New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) (internal quotations omitted).  Here, Summit alleged in the Complaint that LPGA was unjustly enriched by benefits received after termination of the Agreement that were created by Summit's performance.  These benefits were "in the form of long-term, lucrative relationships with licensees of LPGA's property."  Compl. ¶79.  Since LPGA's termination of the Agreement freed it from the obligation to share royalties with Summit, the latter alleged that "LPGA is benefiting at [Summit's] expense" and that "equity and good conscience require restitution of the amounts that it should have received under the royalty-sharing provisions of the Agreement."  Compl. ¶¶81–82.

Summit now argues that its unjust enrichment claim requires the resolution of contested factual issues, including whether breach occurred, when it occurred, what benefits LPGA received since termination of the contract, and how Summit's pre-termination efforts contributed to those benefits, as well as LPGA's ability to obtain new licenses itself.  Specifically, Summit claims that LPGA issued licenses to the entities Pan World Brands and Total Kidswear after the termination of the Agreement; LPGA could

do so only because of Summit's previous efforts with these entities while the Agreement was in effect; and therefore Summit is entitled to royalties received from them.[7]  In response, LPGA argues that Summit's unjust enrichment claim should be limited to its allegations in the Complaint, which listed incoming royalties from deals brokered by Summit, the benefits of LPGA's relationships with its licensees, and the amounts it should have received under the Agreement's royalty-sharing provisions.  LPGA points out that Summit is already receiving these amounts, and argues that it therefore has alleged no damages for its unjust enrichment claim.

Summit failed to allege in the Complaint that LPGA was unjustly enriched by the proceeds of licensing agreements negotiated by Summit yet signed after termination of the Agreement.  Summit did, however, raise this argument during discovery, giving LPGA sufficient notice of it.  In a declaration dated June 16, 2009, Geoffrey Holmes, a founder and principal of Summit, alleged that his company worked to secure lucrative new licenses from Pan World Brands and Total Kidswear, and that LPGA cut it off from its share of the royalties by terminating the Agreement and then securing these licenses.

---

[7] Summit argues in the alternative that royalties from Pan World Brands and Total Kidswear should be included in the recovery of tail payments, rather than quasi-contract unjust enrichment recovery.  While Summit's unjust enrichment argument assumes that LPGA entered into licensing agreements with these entities after terminating its Agreement with Summit, its argument for including them in the tail payments assumes that LPGA entered into these licensing agreements before termination.  If true, the latter theory would constitute breach in and of itself, since the Agreement forbids LPGA from licensing its trademarks on its own.  Agreement ¶2(b)(iii).  Nevertheless, this theory fails, since throughout this litigation Summit has consistently alleged that LPGA entered into licensing agreements with Pan World Brands and Total Kidswear after termination.  *See, e.g.*, G. Holmes Dec. at 15–16 ("After LPGA terminated the agreement it entered into licenses with Pan World Brands and Total Kidswear."); G. Holmes Dep. at 188:23–189:1 ("Q: Then Total Kidswear.  Is that a deal entered into by the LPGA after the end of the agreement with Summit? A: Yes.").  Moreover, Summit claims that breach occurred no later than June 6, 2006 (the date of LPGA's termination notice), while LPGA claimed that it entered into a licensing agreement with Total Kidswear on or around August 1, 2006—the only factual allegation on the record regarding the specific date of this licensing agreement.  Answer ¶48.  Summit offers no new evidence contradicting these factual allegations.  Therefore, recovery of these royalties is only potentially available through Summit's unjust enrichment theory, considered *infra*.

G. Holmes Dec. ¶¶60, 62–63.  Summit has thus preserved its argument for a quasi-contract theory of unjust enrichment.

Nevertheless, Summit's argument fails because it falls under and conflicts with the explicit terms of the Agreement.  Under New York law, "claims for unjust enrichment or *quantum meruit*" are "inapplicable if there is an enforceable contract governing the subject matter."  *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997).  This rule does not apply where the contract does not cover the issue raised in the unjust enrichment claim.  *ILG Capital LLC v. Archipelago, LLC*, 829 N.Y.S.2d 511, 522 (N.Y. App. Div. 2007).  But Summit cannot argue that its post-termination benefits are not covered in the Agreement; it contains detailed tail provisions on the allocation of post-termination royalties from license agreements "existing on the date of termination."  Agreement ¶15.  Pursuant to these provisions, as LPGA points out, Summit has already recouped the costs of the Guarantees, and stands to recover even more.

As for Summit's claim to royalties from licensees Total Kidswear and Pan World Brands, the Agreement explicitly states that all rights to the LPGA trademarks belong to LPGA, and that upon termination, all such rights shall revert to LPGA except for the tail provisions, which again only concern license agreements "existing on the date of termination."  Agreement ¶¶7(a), 15.  Given Summit's repeated allegations that LPGA signed licensing agreements with these entities after terminating its Agreement with Summit, *see supra* note 7, the Agreement explicitly stated that Summit was not entitled to any benefits from these entities.  While Summit contends that its unjust enrichment claim presents contested factual issues—the occurrence of breach, its timing, LPGA's post-termination benefits, and Summit's contribution to them—none of these issues mitigates

15

the fact that the Agreement set forth post-termination royalties for both parties, foreclosing an unjust enrichment claim regarding those royalties.  In sum, Summit's quasi-contract claim for unjust enrichment fails as a matter of law.

Accordingly, Summit is precluded from offering evidence or theories concerning its claim for unjust enrichment as a quasi-contract theory of recovery.

### F.  LPGA's Motion for Exclusion of Evidence on Expenses

LPGA's third and final motion *in limine* requests that if the Court does not grant its second *in limine* motion precluding Summit from pursuing a theory of reliance damages, then it should preclude Summit from offering evidence on its operating expenses, including wages paid.  LPGA claims that Summit offered incomplete discovery regarding these expenses, and that the resultant failure has prejudiced LPGA.  Since LPGA's second motion *in limine* was granted, this third *in limine* motion is now moot.

### G.  Remaining Issues of Material Fact

Summit lists eleven contested issues of material fact: (1) whether LPGA breached the Agreement; (2) the date LPGA breached the Agreement; (3) the benefits Summit conferred on LPGA during the effective period of the Agreement; (4) the benefits conferred after termination; (5) the net benefits Summit received; (6) the goodwill LPGA received due to Summit's efforts under the Agreement; (7) Summit's expenses incurred in performing the Agreement; (8) the parties' contemplation of those expenses; (9) whether LPGA waited until after receiving the 2005 Guarantee payment of $565,000 before suspending its relationship with Summit; (10) whether royalties from particular licensees should be paid as part of the tail; (11) whether Summit is entitled to royalties from Pan World Brands and Total Kidswear International.

Most of these issues are now moot.  Summit's expenses incurred in performance, the parties' contemplation of those expenses, and LPGA's alleged termination immediately after receiving the 2005 Guarantee payment (Summit's issues 7 through 9) are now immaterial because Summit is precluded from introducing evidence or arguments concerning reliance damages.  Similarly, the preclusion of evidence or arguments concerning a quasi-contract unjust enrichment claim renders immaterial the benefits and goodwill Summit conferred on LPGA during and after the Agreement, and any alleged entitlement to royalties from Pan World Brands and Total Kidswear (issues 3 through 6, and 11).

Summit insists that breach of the contract (issue 1) remains a contested issue of material fact, and that absent its resolution, it is impossible to ascertain whether Summit is entitled to damages, and to what extent.  However, as held *supra*, Summit is precluded from introducing evidence or arguments on its theories of restitution damages, reliance damages, and quasi-contract unjust enrichment recovery.  Therefore, even if Summit establishes that LPGA breached the contract, it cannot raise the damages theories of general contract law.  Breach remains a material issue only insofar as it is a necessary predicate to the date of the breach (issue 2), which in turn determines at which point royalties from licensees should be paid to Summit as part of the tail (issue 10).  The parties have disputed the date of the breach; Summit claims it occurred no later than June 6, 2006 (the date of LPGA's termination notice), while LPGA claims it occurred no later than December 31, 2006 (the date when Summit failed to pay the Guarantees for the preceding calendar year).

Whether particular royalties were paid during or after the effective period of the Agreement affects the recovery available to Summit under the tail provisions.  Royalties paid while the Agreement was in force were to be distributed equally between the parties, while royalties paid under the tail—from licensees secured by Summit before termination of the Agreement—went entirely to Summit for three years after termination.  Agreement ¶¶3(a)–(b)(i), 15.  The date of breach would affect the point at which Summit's share of royalties would shift from 50% under the Agreement to 100% under the tail provisions.

In sum, disputed issues of material fact remain as to whether LPGA breached the agreement, the date of breach, and the share of royalties accruing to Summit under the tail provision.  Resolution of these issues will only result in slight changes to Summit's ultimate recovery, and the parties have stated to this Court that most of the relevant sums are not disputed.  Transcript of August 4, 2010 Conference at 5:14–6:1.  Therefore, the parties should resolve these questions without a trial.

### III. CONCLUSION

For the foregoing reasons, LPGA's motions *in limine* to preclude Summit from offering theories or evidence on reliance or restitution damages are granted. LPGA's motion to exclude evidence on expenses is dismissed as moot. Summit is precluded from offering theories or evidence on a quasi-contract theory of unjust enrichment. The case is referred to United States Magistrate Judge Frank Maas for a further settlement conference. The Court strongly encourages the parties to make their best efforts to reach a settlement, and directs them to contact Judge Maas' chambers for scheduling.

SO ORDERED.

Dated:  December 6, 2010
       New York, NY

                                                        U.S.D.J.